UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
UNITED STATES OF AMERICA : 
: 
      - v. - :          S3 15 Cr. 769 (AJN)
: 
ANTHONY R. MURGIO, : 
MICHAEL J. MURGIO, : 
YURI LEBEDEV, and : 
TREVON GROSS, : 
: 
          Defendants. : 
: 
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S OMNIBUS OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS


PREET BHARARA
United States Attorney for the
Southern District of New York


EUN YOUNG CHOI
DANIEL S. NOBLE
Assistant United States Attorneys
   -Of Counsel-

i

## <u>TABLE OF CONTENTS</u>

Preliminary Statement ................................................................................................ 1

Background ............................................................................................................... 2

Legal Standard for Motion to Dismiss Indictment .................................................. 6

POINT I:  COUNTS ONE AND TWO PROPERLY ALLEGE VIOLATIONS OF
18 U.S.C. § 1960 ...................................................................................................... 9

   A.   Applicable Law ............................................................................................. 9

      1.   Title 18, United States Code, Section 1960 ............................................. 9

      2.   The Federal Registration Requirement Under Section 1960(b)(1)(B) ...................... 10

           a.   The Bank Secrecy Act, Title 31, United States Code, Section 5330 ........... 10

           b.   Implementing Regulations Under the Bank Secrecy Act ............................. 12

      3.   Florida State Licensing Requirement Under Section 1960(b)(1)(A) ...................... 13

   B.   Discussion ................................................................................................. 14

      1.   Murgio is Properly Charged Under 18 U.S.C. § 1960(b)(1)(B) ............................. 14

           a.   Virtual Currencies Constitute "Funds" For Purposes of Section 1960 ........ 14

           b.   The S3 Indictment Properly Alleges that Murgio Operated an
Unlicensed  Money Transmitting Business ................................................... 21

           c.   The Cases Cited By Murgio are Not to the Contrary ................................... 27

      2.   Murgio is Properly Charged Under 18 U.S.C. § 1960(b)(1)(A) ............................. 28

      3.   Counts One and Two Should Not Be Dismissed For An Independent Reason ........ 30

POINT II:  COUNT FIVE PROPERLY ALLEGES  A VIOLATION OF 18 U.S.C. § 215(a)(2)
................................................................................................................................ 31

   A.   Applicable Law ........................................................................................... 31

   B.   Discussion .................................................................................................. 33

POINT III:  A BILL OF PARTICULARS IS NOT WARRANTED ............................................ 44

   A.   Applicable Law ........................................................................................................ 44

   B.   Discussion ............................................................................................................... 47

         1.   Gross's Motion for a Bill of Particulars Should Be Denied ......................... 47

         2.   Lebedev's Motion for a Bill of Particulars Should be Denied. ..................... 52

POINT IV:  LEBEDEV'S MOTION TO STRIKE SURPLUSSAGE SHOULD BE DENIED .. 54

   A.   Applicable Law ........................................................................................................ 55

   B.   Discussion ............................................................................................................... 55

POINT V:  LEBEDEV'S RENEWED MOTION FOR SEVERANCE IS WITHOUT MERIT . 57

POINT VI:  THE DEFENDANTS' OTHER REQUESTS ARE MOOT OR PREMATURE ..... 57

   A.   Request for Disclosure of Co-Defendants' Admissions or Confessions ........................... 57

   B.   Request for Immediate *Brady* and *Giglio* Disclosures ....................................... 59

   C.   Request for Rule 404(b) Notice ................................................................................ 61

   D.   Request for the Disclosure of Identities of Confidential Informants or Cooperating Co-Defendants ........................................................................................................ 61

Conclusion ........................................................................................................................ 65

## TABLE OF AUTHORITIES

**Federal Cases**

*Barr* v. *United States*, 324 U.S. 83 (1945) ................................................. 18

*Bifulco* v. *United States*, 447 U.S. 381 (1980) ........................................... 18

*Brady* v. *Maryland*, 373 U.S. 83 (1963) .................................................. 59

*Bruton* v. *United States*, 391 U.S. 123 (1968) ................................ 57, 58, 59

*Callanan* v. *United States*, 364 U.S. 587 (1961) ...................................... 19

*Clark* v. *Martinez*, 543 U.S. 371, 381 (2005) ........................................... 19

*Giglio* v. *United States*, 405 U.S. 150 (1972) .......................................... 59

*Hamling* v. *United States*, 418 U.S. 87 (1974) ...................................... 7, 22

*Hayden* v. *Pataki*, 449 F.3d 305 (2d Cir. 2006) ....................................... 18

*In re United States*, 834 F.2d 283, 286-87 (2d Cir. 1987) ....................... 57, 60

*Morissette* v. *United States*, 342 U.S. 246 (1952) ..................................... 35

*Russell* v. *United States*, 369 U.S. 749 (1962) .................................. 36, 37, 38

*Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van
Saybolt Int'l B.V.* v. *Schreiber*, 327 F.3d 173 (2d Cir. 2003) .................... 32

*Taniguchi* v. *Kan Pacific Saipan, Ltd.*, 132 S.Ct. 1997 (2012) .................... 14

*United States* v. *Alessi*, 638 F.2d 466 (2d Cir. 1980) .................................. 61

*United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998) ........................ 7, 8, 34

*United States* v. *Bah*, 574 F.3d 106 (2d Cir. 2009) .............................. 18, 27

*United States* v. *Bala*, 236 F.3d 87 (2d Cir. 2000) .................................... 49

*United States* v. *Baxter*, 884 F.2d 734 (3d Cir. 1989) ............................... 50

*United States* v. *Bejasa*, 904 F.2d 137 (2d Cir. 1990) ) ............................. 62

*United States* v. *Bin Laden*, 91 F. Supp. 2d 600 (S.D.N.Y. 2000) ............... 55

*United States* v. *Bonito*, 57 F.3d 167 (2d Cir. 1995) ................................. 32

*United States* v. *Brunson*, 882 F.2d 151 (5th Cir. 1989) ............................................ 32, 36, 38, 41

*United States* v. *Budovsky*, No. 13 Cr. 368 (DLC), 2015 WL 5602853 (S.D.N.Y. Sept. 23, 2015) ........................................................................................................................ *passim*

*United States* v. *Carrizo*, No. 95 Cr. 779 (HB), 1996 WL 208186 (S.D.N.Y. Apr. 26, 1996) ........................................................................................................................ 31, 50, 51

*United States* v. *Cephas*, 937 F.2d 816 (2d Cir. 1991) ............................................................ 45

*United States* v. *Chen*, 378 F.3d 151 (2d Cir. 2004) ............................................................ 45

*United States* v. *Coffey*, 361 F. Supp. 2d 102 (E.D.N.Y. 2005) ...................................................... 7

*United States* v. *Cook*, 13 Cr. 777 (AJN), 2014 U.S. Dist. LEXIS 182268 (S.D.N.Y. Mar. 10, 2014) ........................................................................................................... 53, 62, 63

*United States* v. *Coppa*, 267 F.3d 132 (2d Cir. 2001) .......................................................... 59, 60

*United States* v. *Coppola*, 671 F.3d 220 (2d Cir. 2012) ............................................................ 52

*United States* v. *Crember*, No. 12 Cr. 473 (KBF) (S.D.N.Y. Dec. 13, 2012) ............................... 8

*United States* v. *Crispo*, 47 Fed. Appx. 39 (2d Cir. 2002) ........................................................... 22

*United States* v. *Cruikshank*, 92 U.S. 542 (1875) ..................................................................... 37

*United States* v. *Davis*, 689 F.3d 179 (2d Cir. 2012) ................................................................ 50

*United States* v. *Davis*, No. 06 Cr. 911 (LBS), 2009 WL 637164 (S.D.N.Y. Mar. 11, 2009) .... 60

*United States* v. *D'Amelio*, 683 F.3d 412 (2d Cir. 2012)................................................... 7, 22, 24

*United States* v. *Denny*, 939 F.2d 1449, 1450 (10th Cir. 1991) ............................................. 31, 32

*United States* v. *DePalma*, 461 F. Supp. 778 (S.D.N.Y. 1978).................................................... 55

*United States* v. *E-Gold, Ltd*, 550 F. Supp. 2d 82 (D.D.C. 2008) ...................................... *passim*

*United States* v. *Elfgeeh*, 515 F.3d 100 (2d Cir. 2008) .............................................................. 27

*United States* v. *Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014)............................................. *passim*

*United States* v. *Fields*, 113 F.3d 313 (2d Cir. 1997) .......................................................... 62, 63

*United States* v. *Foley*, 73 F.3d 484 (2d Cir. 1996) ................................................................. 36

*United States* v. *Gallo*, No. 98 Cr. 338 (JGK), 1999 WL 9848 (S.D.N.Y. Jan. 11, 1999) .... 58, 61

*United States* v. *Henry*, 861 F. Supp. 1190 (S.D.N.Y. 1994). ................................................. 47, 59

*United States* v. *Jackson*, 345 F.3d 59 (2d Cir. 2003) ................................................................ 62

*United States* v. *Jordan*, 560 F. App'x 945 (11th Cir. 2014) ................................................. 32, 41

*United States* v. *LaSpina*, 299 F.3d 165 (2d Cir. 2002)................................................................. 8

*United States* v. *Leonelli*, 428 F. Supp. 880 (S.D.N.Y. 1977) ................................................... 46

*United States* v. *Litchfield*, 986 F.2d  (2d Cir. 1993)................................................................. 19

*United States* v. *Lott*, 750 F.3d 214 (2d Cir. 2014)...................................................................... 26

*United States* v. *Mahabub*, No. 13 Cr. 908 (AJN), 2014 WL 4243657 (S.D.N.Y. Aug. 26, 2014)
.................................................................................................................................................. 45, 47

*United States* v. *Marcus*, 628 F.3d 36, 41 (2d Cir. 2010) ......................................................... 45

*United States* v. *Martinez*, 634 F. Supp. 1144 (S.D.N.Y.1986) ................................................. 63

*United States* v. *Martino*, No. 00 Cr. 389 (RCC), 2000 WL 1843233 (S.D.N.Y. Dec. 14, 2000)
...................................................................................................................................................... 49

*United States* v. *McElroy*, 910 F.2d 1016, 1022 (2d Cir. 1990) ........................................... *passim*

*United States* v. *Medley*, 913 F.2d 1248, 1261 (7th Cir. 1990) ................................................. 39

*United States* v. *Mitlof*, 165 F. Supp. 2d 558 (S.D.N.Y. 2001) ................................................. 46

*United States* v. *Mostafa*, 965 F. Supp. 2d 451 (S.D.N.Y. 2013) ............................................. 56

*United States* v. *Munoz*, 736 F. Supp. 502 (S.D.N.Y. 1999) ..................................................... 58

*United States* v. *Muyet*, 945 F. Supp. 586 (S.D.N.Y. 1996)...................................................... 45

*United States* v. *Nelson*, 712 F.3d 498 (11th Cir. 2013) ............................................................ 36

*United States* v. *Nixon*, 418 U.S. 683 (1974) ............................................................................. 60

*United States* v. *Noble*, No. 07 Cr. 284 (RJS), 2008 WL 1990707 (S.D.N.Y. May 7, 2008) ..... 60

*United States* v. *Oakland Cannabis Buyers' Coop.*, 532 U.S. 483 (2001) .................................. 19

*United States* v.  *Ojeikere*, 299 F. Supp. 2d 254 (S.D.N.Y. 2004) ............................................. 64

*United States* v. *Pagan*, 721 F.2d 24 (2d Cir. 1983)................................................................ 7, 34

*United States* v. *Panza*, 750 F.2d 1141 (2d Cir. 1984) .................................................... 46

*United States* v. *Percevault*, 490 F.2d 126 (2d Cir. 1974)................................................. 57

*United States* v. *Perez*, 575 F.3d 164 (2d Cir. 2009) ...................................................... 41

*United States* v. *Perez*, 940 F. Supp. 540 (S.D.N.Y. 1996) ............................................ 61

*United States* v. *Pfeiffer*, 371 F.3d 430 (8th Cir. 2004)................................................... 20

*United States* v. *Pirro*, 212 F.3d 86 (2d Cir. 2000) ....................................................... 43

*United States* v. *Resendiz-Ponce*, 549 U.S. 102 (2007) ......................................... 8, 38, 43

*United States* v. *Rittweger*, 259 F. Supp. 2d 275 (S.D.N.Y. 2003)................................... 55

*United States* v. *Rodriguez*, No. 08 CR 1311 (RPP), 2009 WL 2569116 (S.D.N.Y. Aug. 20, 2009) ..................................................................................................................... 59

*United States* v. *Rooney*, 37 F.3d 847 (2d Cir. 1994) ..................................................... 42

*United States* v. *Rosenblatt*, 554 F.2d 36 (2d Cir. 1977) ............................................... 37

*United States* v. *Rutigliano*, 790 F.3d 389 (2d Cir. 2015) ............................................. 50

*United States* v. *Saa*, 859 F.2d 1067 (2d Cir.1989) .................................................. 62, 63

*United States* v. *Sabbeth*, 262 F.3d 207, 218 (2d Cir. 2001) ........................................... 7

*United States* v. *Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721 (S.D.N.Y. Jan. 23, 2009) ..................................................................................................................... 47

*United States* v. *Santopietro*, 166 F.3d 88 (2d Cir. 1999) ............................................... 37

*United States* v. *Scarpa*, 913 F.2d 993 (2d Cir. 1990).................................................... 55

*United States* v. *Sindona*, 636 F.2d 792 (2d Cir. 1980).................................................... 7

*United States* v. *Speare*, 297 F.2d 408 (2d Cir. 1962) .................................................... 35

*United States* v. *Stavroulakis*, 952 F.2d 686 (2d Cir. 1992) ..................................... *passim*

*United States* v. *Stein*, 424 F.Supp.2d 720 (S.D.N.Y. 2006) .......................................... 58

*United States* v. *Stephenson,* 895 F.2d 867 (2d Cir. 1990) ............................................. 51

*United States* v. *Thompson*, No. 13 Cr. 378 (AJN), 2013 WL 6246489 (S.D.N.Y. Dec. 3, 2013) .......................................................................................................... *passim*

*United States* v. *Torres*, 901 F.2d 205 (2d Cir. 1990) ........................................................ 45, 46

*United States* v. *Tramunti*, 513 F.2d 1087 (2d Cir. 1975) ..................................................... 7

*United States* v. *Trippe,* 171 F. Supp. 2d (S.D.N.Y. 2001) ....................................... 45, 46, 53, 60

*United States* v. *Ulbricht*, 31 F. Supp. 3d 540 (S.D.N.Y. 2014) ........................................... 17, 18

*United States* v. *Ulbricht*, No. 14 Cr. 68 (KBF), 2014 WL 5090039 (S.D.N.Y. Oct. 10, 2014)......
.................................................................................................................................... 55, 56

*United States* v. *Valenzuela-Bernal*, 458 U.S. 858 (1982) ........................................... 63

*United States* v. *Velastegui*, 199 F.3d 590 (2d Cir. 1999) ........................................... 28

*United States* v. *Vilar*, 729 F.3d 62 (2d Cir. 2013)................................................. 21, 22

*United States* v. *Walsh*, 194 F.3d 37 (2d Cir. 1999) ........................................... 7, 35, 45

*United States* v. *Watts*, No. 98 Cr. 1082 (DAB), 1999 WL 269868 (S.D.N.Y. May 4, 1999)..... 22

*United States* v. *Wei*, 862 F. Supp. 1129 (S.D.N.Y. 1994) ........................................... 58

*United States* v. *Wydermyer*, 51 F.3d 319 (2d Cir. 1995)....................................... 8

*United States* v. *Zacher*, 586 F.2d 912 (2d Cir. 1978) ............................................. 43

*United States* v. *Zemlyansky*, No. 12 Cr. 171 (JPO), 2013 WL 2151228 (S.D.N.Y. May 20, 2013)
.................................................................................................................................... 46

*Weatherford* v. *Bursey*, 429 U.S. 545 (1977) ........................................... 61

**Federal Statutes**

18 U.S.C. § 215.......................................................................................... *passim*

18 U.S.C. § 1960........................................................................................ *passim*

31 U.S.C. § 5312...................................................................................... 11, 12

31 U.S.C. § 5313.................................................................................. 11, 12, 22

31 U.S.C. § 5330........................................................................................ *passim*

**Federal Rules**

Fed. R. Crim. P. 7 ....................................................................................... 7, 54

Fed. R. Crim. P. 16 ......................................................................................... 61

**Federal Regulations**

31 C.F.R. § 1010.100 ........................................................................................... *passim*

31 C.F.R. § 1022.380 ................................................................................................... 12

Department of the Treasury Financial Crimes Enforcement Network, Guidance on the
    Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using
    Virtual Currencies, March 18, 2013, FIN-2013-G001 ..................................................... *passim*

**Florida Authorities**

Fla. Stat. Ann. § 560.125 ...................................................................................... *passim*

Fla. Stat. Ann. § 560.103 ...................................................................................... *passim*

*In re E-Gold Ltd. et al.*, State of Florida Office of Financial Regulation, Administrative
Proceeding No. 0342-M-09/09, 2010 WL 7506250 (Fla. Off. Fin. Reg. Sept. 20, 2010) ........... 29

*State of Florida* v. *Michell Abner Espinoza*, No. F. 14-002923 (Fla. Miami-Dade Cir. Ct.) ....... 30

*State of Florida* v. *Pascal Reid*, No. 14-002935 (Fla. Miami-Dade Cir. Ct.) .............................. 30

**Other Authorities**

E. Devitt, C. Blackmar & K. O'Malley, Fed. Jury Practice and Instr. (4th ed. 1990) ................. 32

Black's Law Dictionary (9th ed. 2009) ....................................................................... 15

Merriam-Webster Online ........................................................................................... 15

Oxford English Dictionary (2d ed. 1989) ................................................................... 15

Random House Dictionary (4th ed. 2001) ................................................................... 15

## PRELIMINARY STATEMENT

The Government respectfully submits this Memorandum of Law in opposition to the pretrial motions filed by defendants Anthony R. Murgio, Yuri Lebedev, and Trevon Gross (*see* Dkt. Nos. 129, 130, 132, 134, 138), and the memoranda of law in support thereof.[1]

The defendants' motions are either moot or lacking in merit.  *First*, Murgio's motion to dismiss Counts One and Two, and Gross's motion to dismiss Count Five, should be denied because the Indictment adequately pleads (a) that Murgio owned and operated the Bitcoin exchange Coin.mx without complying with Federal or Florida registration and licensing requirements, and knowingly allowed others to use Coin.mx in furtherance of ransomware schemes, and (b) that Gross "corruptly" received bribes from Murgio, Lebedev, and their co-conspirators to permit them to take control of the federal credit union for which he served as Chairman of the Board.  *Second*, Gross's and Lebedev's motions for a bill of particulars should be denied because the Indictment, the Complaints against Murgio and Lebedev, the voluminous discovery and voluntary productions by the Government, and other communications between the Government and counsel have placed the defendants on adequate notice as to the nature of the charges pending against them and the basis for venue in this District.  *Third*, because the defendants' other motions amount to little more than improper requests for a preview of the evidence and witnesses the Government will present at trial are rendered moot by the Court's

---

[1]      As used herein, "Murgio MTD Br." refers to the Memorandum of Law in Support of Defendant Anthony Murgio's Motion to Dismiss Counts One and Two of the Indictment (Dkt. No. 133); "Murgio Omni. Br." refers to the Memorandum of Law in Support of Defendant Anthony Murgio's Motion for Omnibus Pre-Trial Relief (Dkt. No. 131); "Lebedev Br." refers to the Memorandum of Law in Support of Yuri Lebedev's Omnibus Pretrial Motions (Dkt. No. 135); and "Gross Br." refers to the Memorandum of Law in Support of Defendant Trevon Gross's Motion to Dismiss and Demands for a Bill of Particulars (Dkt. Nos. 129-1, 140).

June 28, 2016 scheduling order (Dkt. No. 156), or are without merit, they should also denied.

In sum, the defendants' motions should be denied in their entirety.

## BACKGROUND

This case arises out of an investigation into an illegal online virtual currency exchange known as Coin.mx that was founded Anthony Murgio in Florida.  (*See* Superseding Indictment, *United States* v. *Anthony Murgio et al.*, S3 15 Cr. 769 (AJN) (S.D.N.Y. Apr. 21, 2016) ("S3 Indictment"), at ¶ 3).  Coin.mx—which Murgio operated with technical assistance from co-defendant Yuri Lebedev—was a website that allowed its customers, for a fee, to convert United States dollars into Bitcoins, and vice versa, and to transmit Bitcoins and dollars to other accounts.  (*See id.*; *see also* Complaint, *United States* v. *Lebedev*, 15 Mag. 2501 (S.D.N.Y. July 17, 2015) ("Lebedev Compl.")).  Customers could purchase Bitcoins from Coin.mx in a variety of ways, including by credit card, by wire transfer, and for a period of time, by depositing cash into one of Coin.mx's bank accounts.  (*See* S3 Indictment ¶ 3; *see also* Complaint, *United States* v. *Murgio*, 15 Mag. 2508 (S.D.N.Y. July 17, 2015) ("Murgio Compl."), at ¶ 15).  Customers could hold their Bitcoins on Coin.mx, transfer them to other Bitcoin addresses, or exchange them for real currency, which could be withdrawn from Coin.mx to the customers' bank accounts.  (*See* Murgio Compl. ¶ 17).  From in or about October 2013 until July 2015, Coin.mx exchanged millions of dollars for Bitcoins on behalf of its customers.  (*See* S3 Indictment ¶ 3).

Murgio, with the assistance of other individuals, including Lebedev, operated Coin.mx without complying with applicable federal and state registration and licensing requirements.  (*See* S3 Indictment ¶¶ 4, 11, 12, 15).  Under federal law, Bitcoin and other virtual currency exchanges, such as Coin.mx, are considered "money transmitting businesses" and subject to federal anti-money laundering regulations if they do substantial business in the United States.  *See, e.g.,* 31 U.S.C. § 5330;  31 C.F.R. § 1010.100(ff)(5); *see also* Department of the Treasury

Financial Crimes Enforcement Network ("FinCEN"), Guidance on the Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies, March 18, 2013, FIN-2013-G001 ("FinCEN March 2013 Guidance"). (*See* S3 Indictment ¶¶ 11, 12, 15; Murgio Compl. ¶ 12(a)). Bitcoin is an anonymous, decentralized form of electronic currency that exists entirely on the Internet and not in any physical form. (*See* Murgio Compl. ¶ 11(a)). Although Bitcoin is not illegal in and of itself, because of the ease with which Bitcoin can be used to move money anonymously, it is known to be used by individuals to facilitate illicit transactions and for money laundering. (*See id.*). Virtual currency exchanges are, therefore, required to register with FinCEN as money services businesses and to develop and maintain an effective anti-money laundering program. (*See id.* ¶ 12(b)). Certain states, including Florida where Coin.mx was based, also have licensing requirements that apply to virtual currency exchanges. *See generally* Fla. Stat. Ann. § 560.125 (West 2014).

Knowing full well the registration requirements for legally operating a Bitcoin exchange, at no time did Murgio register Coin.mx with FinCEN or with the Florida Office of Financial Regulation. (*See* S3 Indictment ¶¶ 4, 12; Murgio Compl. ¶¶ 13, 14(a)(i)). To the contrary, Murgio—with the assistance of Lebedev and others who were employed by Murgio—went to great lengths to hide the true nature of Coin.mx, from both regulators and financial institutions, in order to evade detection of his unlawful business. (*See* S3 Indictment ¶ 5). For instance, Murgio operated a phony front company "Collectables Club," complete with a sham website that was maintained by Lebedev, in an effort to trick financial institutions through which Coin.mx operated into believing that his business was simply a private members-only association of individuals who discussed, bought, and sold collectable items, such as stamps and sports memorabilia. (*See* S3 Indictment ¶ 5; Murgio Compl. ¶¶ 19, 24; Lebedev Compl. ¶¶ 12, 24).

3

Similarly, to avoid having Coin.mx's bank accounts closed, Murgio opened bank accounts in the name of "Collectables Club," rather than Coin.mx; lied to banks about the nature of the Collectables Club/Coin.mx business; and even had Coin.mx's employees instruct customers lie to banks about the nature of the Bitcoin transactions that they were seeking to conduct on Coin.mx.  (*See* S3 Indictment ¶¶ 6, 8; Murgio Compl. ¶¶ 19, 21).  In addition, Murgio knowingly caused Coin.mx customers' credit and debit card transactions to be miscoded so as to make the transactions appear to be for items that were not Bitcoins in a further effort to avoid detection by financial institutions and help ensure the transactions were approved.  (*See* S3 Indictment ¶ 7).

As part of the unlawful Coin.mx scheme, Murgio knowingly processed and profited from numerous Bitcoin transactions involving victims of ransomware schemes.  (*See* S3 Indictment ¶ 9; Murgio Compl. ¶¶ 9, 25-26).  Ransomware is a type of malicious software, or malware, that restricts access to an infected computer system and demands that the user pay a ransom, oftentimes in Bitcoin, to the malware operators in order to remove the restriction.  (*See* S3 Indictment ¶ 9).  By facilitating victims' purchases of Bitcoins so that the victims could pay ransoms to hackers to regain control of their computers, Murgio knowingly enabled the hackers behind the ransomware attacks to receive the proceeds of their crimes, while earning a profit for Coin.mx.  (*See* S3 Indictment ¶ 9; Murgio Compl. ¶ 9).  Indeed, hackers using one form of ransomware called "Cryptowall" even specifically directed their victims to Coin.mx to obtain the Bitcoins needed to pay the ransoms.  (*See* Murgio Compl. ¶ 25).

In 2014, in an effort to facilitate Coin.mx's operation and further evade scrutiny by financial institutions, Murgio, with the assistance of his father, Michael Murgio, and Lebedev attempted to take control of Helping Other People Excel Federal Credit Union ("HOPE FCU"), a small federal credit union in New Jersey with primarily low-income members.  (*See* S3

Indictment ¶ 10; Murgio Compl. ¶ 27).  To obtain control of HOPE FCU, Murgio arranged for

bribes to be paid to co-defendant Trevon Gross, the Chairman of the Board of Directors of

HOPE FCU.  (*See* S3 Indictment ¶ 10).  Thereafter, Gross facilitated Murgio's takeover of

HOPE FCU, including by arranging for the Board to nominate and elect Lebedev (who himself

offered $41,000 of his own money to pay Gross) and other individuals loyal to Murgio to HOPE

FCU's Board.  (*See id.*; Murgio Compl. ¶¶ 27(a), 27(c); Lebedev Compl. ¶ 23).  While in control

of HOPE FCU, Murgio arranged for a particular payment processor used by Coin.mx to process

Bitcoin transactions to open an account at HOPE FCU.  (*See* Murgio Compl. ¶ 27(b)).  Murgio

and the payment processor then used the HOPE FCU account to process Coin.mx transactions,

among millions of dollars in other transactions.  (*See id.*).  In sum, over $150,000 was paid by

Murgio, Lebedev, and their co-conspirators to bank accounts controlled by Gross, who in turn

spent those proceeds on personal expenses, including payments on his personal credit cards.

(*See* S3 Indictment ¶¶ 10, 19).

On April 14, 2016, a grand jury sitting in this District returned a detailed 20-page

superseding indictment, S3 15 Cr. 769 (AJN).  The S3 Indictment charges Murgio in eight

counts:  (1) conspiracy to operate an unlicensed money transmitting business, in violation of 18

U.S.C. § 371 (Count One); (2) operation of an unlicensed money transmitting business, in

violation of 18 U.S.C. §§ 1960 and 2 (Count Two); (3) conspiracy to make corrupt payments

with intent to influence an officer of a financial institution, in violation of 18 U.S.C. § 371

(Count Three); (4) making corrupt payments with intent to influence an officer of a financial

institution, in violation of 18 U.S.C. §§ 215(a) and 2 (Count Four); (5) conspiracy to commit

wire fraud, in violation of 18 U.S.C. § 1349 (Count Six); (6) wire fraud, in violation of 18 U.S.C.

§ 1343 (Count Seven); (7) conspiracy to commit money laundering, in violation of 18 U.S.C.

§ 1956(h) (Count Eight); and (8) money laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 2 (Count Nine).  The S3 Indictment also charges Lebedev and Michael Murgio in Counts Three and Four.  The S3 Indictment charges Gross with corruptly accepting payments with the intent to be influenced with respect to the business of a financial institution, in violation of 18 U.S.C. § 215(a)(2) (Count Five).  The S3 Indictment was unsealed on April 21, 2016.

Since January 2016, the Government has produced substantial discovery to the defendants and voluntarily produced additional materials in response to multiple discovery requests by defense counsel.  Relevant to the instant motions, the discovery produced to date comprises principally the following:  (1)  emails and electronic evidence obtained pursuant to search warrants on email accounts and devices belonging to the defendants and their co-conspirators; (2) records for bank accounts and payment processors used to operate Coin.mx and pay bribes to Gross; (3) records obtained from various internet service providers and financial companies relating to the operations of Coin.mx and HOPE FCU; and (4) records obtained from HOPE FCU and its regulator, the National Credit Union Administration ("NCUA"), relating to the operation of HOPE FCU during the relevant time period.  Among the NCUA materials are documents reflecting its determination that Gross had egregiously breached his fiduciary duties to HOPE FCU and its members by soliciting and accepting bribes and operating the credit union in a financially unsafe and unsound manner, which ultimately led the NCUA to place HOPE FCU into conservatorship and then liquidation.

Trial is scheduled to begin on October 31, 2016.

## **LEGAL STANDARD FOR MOTION TO DISMISS INDICTMENT**

Rule 7 of the Federal Rules of Criminal Procedure requires that an indictment contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c). "'[A]n indictment is sufficient if it, first, contains the elements

of the offense charged and fairly informs a defendant of the charge against which he must

defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions

for the same offense.'" *United States* v. *Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (quoting

*Hamling* v. *United States*, 418 U.S. 87, 117 (1974)).

The Second Circuit has "repeatedly refused, in the absence of any showing of prejudice,

to dismiss charges for lack of specificity." *United States* v. *Walsh*, 194 F.3d 37, 45 (2d Cir.

1999); *accord United States* v. *Stringer*, 730 F.3d 120, 125 (2d Cir. 2013). Indeed, the Second

Circuit has "consistently upheld indictments that 'do little more than to track the language of the

statute charged and state the time and place (in approximate terms) of the alleged crime.'"

*Walsh*, 194 F.3d at 44 (citing *United States* v. *Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)).

While the indictment must give a defendant "sufficient notice of the 'core of criminality' to be

proven against him," *United States* v. *Pagan*, 721 F.2d 24, 27 (2d Cir. 1983) (quoting *United

States v. Sindona*, 636 F.2d 792, 797-98 (2d Cir. 1980)), the "'core of criminality' of an offense

involves the essence of a crime, in general terms," and not "the particulars of how a defendant

effected the crime." *United States* v. *D'Amelio*, 683 F.3d 412, 418 (2d Cir. 2012); *see also

United States* v. *Coffey*, 361 F. Supp. 2d 102, 111 (E.D.N.Y. 2005) ("[T]he indictment does not

have to specify evidence or details of how the offense was committed.").

"An indictment must be read to include facts which are necessarily implied by the

specific allegations made." *United States* v. *Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992).

"[C]ommon sense and reason prevail over technicalities." *United States* v. *Sabbeth*, 262 F.3d

207, 218 (2d Cir. 2001); *see also United States* v. *Resendiz-Ponce*, 549 U.S. 102, 107 (2007)

("While detailed allegations might well have been required under common-law pleading rules,

they surely are not contemplated by Rule 7(c)(1), which provides that an indictment 'shall be a

7

plain, concise, and definite written statement of the essential facts constituting the offense charged.'" (quoting Fed. R. Crim. P. 7(c)(1)) (citation omitted)).  Moreover, "[i]t is well settled that in an indictment for conspiring to commit an offense – in which the conspiracy is the gist of the crime – it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy." *United States* v. *Wydermyer*, 51 F.3d 319, 325 (2d Cir. 1995); *see also United States* v. *LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002).  "The rationale is that the crime of conspiracy is complete whether or not the substantive offense which was its object was committed." *Wydermyer*, 51 F.3d at 325.

A motion to dismiss an indictment is not an occasion to evaluate the sufficiency of the Government's evidence.  Rule 12(b), which governs criminal pretrial motions, provides only that "[a]ny defense, objection, or request *which is capable of determination without the trial of the general issue* may be raised before trial by motion" (emphasis added).  "In other words, there is no 'summary judgment' equivalent to Rule 56 of the Federal Rules of Civil Procedure in criminal cases." *United States* v. *Crember*, No. 12 Cr. 473 (KBF) (S.D.N.Y. Dec. 13, 2012) (citing *Alfonso*, 143 F.3d at 776–77).

## POINT I:  COUNTS ONE AND TWO PROPERLY ALLEGE VIOLATIONS OF 18 U.S.C. § 1960

Murgio argues for dismissal of the Section 1960 charges alleged in Counts One and Two – the operation of Coin.mx without complying with federal and state registration and licensing requirements and in furtherance of other criminal activity – on the ground that those counts fail to state a crime.  Murgio's argument ignores not only the plain language of Section 1960 and the applicable FinCEN interpretive guidance, but rulings from courts in this District and others holding that Section 1960 applies to virtual currency exchanges like Coin.mx.  The motion should be denied.

### A.    Applicable Law

### 1.    Title 18, United States Code, Section 1960

Title 18, United States Code, Section 1960 makes criminally liable anyone who "knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business."  18 U.S.C. § 1960(a).  Section 1960 broadly defines the term "money transmitting" to include "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."  *Id*. § 1960(b)(2).   The statute states that a business is an "unlicensed money transmitting business" if it is "a money transmitting business which affects interstate or foreign commerce in any matter or degree," *id.* § 1960(b)(1), and either

> (a) "is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under state law," *id.* § 1960(b)(1)(A) (the "State licensing requirement");

> (b) fails to comply with the "registration requirements under section 5330 of Title 31, United States Code, or regulations prescribed under such section," *id.* § 1960(b)(1)(B) (the "Federal registration requirement"); or

9

(c) "otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity," *id.* § 1960(b)(1)(C).

In short, "[i]n order to be guilty of a violation of Section 1960 . . . an entity must first, as a prerequisite, be a business that engages in 'money transmitting' as so defined in Section 1960(b)(2)," and "in addition . . . a defendant must also either operate without a state license, fail to comply with the registration requirements of Section 5330, or otherwise transmit funds that the defendant knows were derived from or intended to support an unlawful activity." *United States* v. *E-Gold*, *Ltd*, 550 F. Supp. 2d 82, 90 (D.D.C. 2008); *see also United States* v. *Budovsky*, No. 13 Cr. 368 (DLC), 2015 WL 5602853, at *6 (S.D.N.Y. Sept. 23, 2015) (describing statutory scheme of Section 1960).

## 2. The Federal Registration Requirement Under Section 1960(b)(1)(B)

### a. The Bank Secrecy Act, Title 31, United States Code, Section 5330

For prosecutions of violations of Section 1960(b)(1)(B), the Government must prove that the money transmitting business at issue failed to register under the Federal registration requirements set forth under Title 31, United States Code, Section 5330. Section 5330, a provision of the Bank Secrecy Act ("BSA"), *codified at* 31 U.S.C. §§ 5311 *et seq.*, governs the registration of money transmitting businesses. Section 5330 states, in relevant part, that "any person who owns or controls a money transmitting business shall register the business . . . with the Secretary of the Treasury[.]" 31 U.S.C. § 5330(a)(1). The statute describes the date by which such registration must occur and the contents of the registration, *see id.* § 5330(a)-(b), and authorizes the Secretary of the Treasury to issue regulations addressing the form and manner of the registration and the criteria for being treated as an agent of the business, *see id.* § 5330(a)(2), (c).

Section 5330 defines a "money transmitting business" as follows:

(1)    Money transmitting business. — The term "money transmitting business" means any business other than the United States Postal Service which —

    (A)    provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system;

    (B)    is required to file reports under section 5313; and

    (C)    is not a depository institution (as defined in section 5313(g)).

*Id.* § 5330(d)(1) .  In short, Section 5330 requires registration of any business engaged in the transmission of funds, other than a depository institution, that is required to file reports under Title 31, United States Code, Section 5313.

Section 5313, in turn, governs the filing of "currency transaction reports," commonly known as "CTRs."  The provision requires a CTR to be filed with the Secretary of the Treasury when a "domestic financial institution" is involved in a transaction involving U.S. coins or currency over a certain amount or in any other circumstances prescribed by regulation.  *Id.* § 5313(a).[2]  Definitions for the various terms used in Section 5313, and elsewhere in this subchapter of the United States Code, are set forth in 31 U.S.C. § 5312.  Section 5312 states that

---

[2]    The section, entitled "Reports on domestic coins and currency transactions," reads in full:

When a domestic financial institution is involved in a transaction for payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes.

31 U.S.C. § 5313(a).

11

the term "domestic financial institution" "appli[es] to an action in the United States of a financial agency or institution." 31 U.S.C. § 5312(b)(1). The term "financial institution" is defined to include a broad array of entities, including any "person who engages as a business in the transmission of funds." 31 U.S.C. § 5312(a)(2)(R). The statute defines "financial agency" to include "any business . . . which engages in any activity which the Secretary of the Treasury determines, by regulation, to be an activity which is similar to, related to, or a substitute for any activity in which any business described in this paragraph is authorized to engage; or any other business designated by the Secretary whose cash transactions have a high degree of usefulness in criminal . . . matters." *Id.* §§ 5312(a)(2)(Y)-(Z). Accordingly, to the extent that a money transmitting business acts in the United States, Section 5313 requires the business to file CTRs when required to do so by regulation.

### b.       Implementing Regulations Under the Bank Secrecy Act

The implementing regulations for the Bank Secrecy Act are administered by the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") and are found in Chapter X of Title 31 of the Code of Federal Regulations (the "FinCEN Regulations"). The FinCEN Regulations spell out in greater detail what types of businesses are subject to Section 5330's registration requirement. In particular, the FinCEN Regulations make clear that the requirement applies to any entity falling within one of the categories of "money services business" set forth in the regulations. *See* 31 C.F.R. § 1022.380 (providing that any entity qualifying as a "money services business" under the regulations "must register with FinCEN"). The term "money services business" is defined to include any "money transmitter," *see id.* § 1010.100(ff)(5)(i), which is defined as follows:

> (A)      A person that provides money transmission services. The term "money
> transmission services" means the acceptance of currency, funds, or other value

12

that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means. "Any means" includes, but is not limited to, through a financial agency or institution; a Federal Reserve Bank or other facility of one or more Federal Reserve Banks, the Board of Governors of the Federal Reserve System, or both; an electronic funds transfer network; or an informal value transfer system; or

(B)     Any other person engaged in the transfer of funds.

31 C.F.R. § 1010.100(ff)(5)(i).

### 3.      Florida State Licensing Requirement Under Section 1960(b)(1)(A)

Section 1960(b)(1)(A) prohibits the operation of a money transmitting business "without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable."

Section 560.125(1) within Chapter 560 of the Florida Statutes states that "[a] person may not engage in the business of a money services business or deferred presentment provider in this state unless the person is licensed or exempted from licensure under this chapter."  Fla. Stat. Ann. § 560.125(1).  The Florida Statutes further define a "money services business" as "any person located in or doing business in this state, from this state, or into this state from locations outside this state or country who acts as a payment instrument seller, foreign currency exchanger, check casher, or money transmitter."  *Id.* § 560.103(22).  "Money transmitter" is defined under Florida law as "a corporation, limited liability company, limited liability partnership, or foreign entity qualified to do business in this state which receives currency, monetary value, or payment instruments for the purpose of transmitting the same by any means, including transmission by wire, facsimile, electronic transfer, courier, the Internet, or through bill payment services or other

13

businesses that facilitate such transfer within this country, or to or from this country." *Id.*
§ 560.103(23).

The terms "currency," "monetary value," and "payment instruments" are also defined by
Florida statute.  Although "currency" is limited to "the coin and paper money of the United
States or of any other country which is designated as legal tender and which circulates and is
customarily used and accepted as a medium of exchange in the country of issuance," *id.*
§ 560.103(11), "monetary value" and "payment instrument" are both defined broadly to include
"a medium of exchange, whether or not redeemable in currency," *id.* § 560.103(21) (defining
"monetary value"), and "a check, draft, warrant, money order, travelers check, electronic
instrument, or other instrument, payment of money, or monetary value whether or not
negotiable," *id.* § 560.103(29) (defining "payment instrument").

**B.**     **Discussion**

### 1.     Murgio is Properly Charged Under 18 U.S.C. § 1960(b)(1)(B)

Murgio argues that Bitcoin falls outside the scope of Section 1960 because virtual
currencies, including Bitcoin, do not constitute either "money" or "funds" under the statute.
(Murgio MTD Br. 6-11).  This argument is without merit, and every court to have examined this
argument in the context of Section 1960 (and Section 1956, the money laundering statute), has
rejected it.  This Court should do the same.

### a.     Virtual Currencies Constitute "Funds" For Purposes of Section 1960

Section 1960 broadly defines "money transmitting" to include "transferring *funds* on
behalf of the public *by any and all means*."  18 U.S.C. § 1960(b)(2) (emphasis added).  Because
the statute does not specifically define the term "funds," the term is given its ordinary meaning.
*See Taniguchi* v. *Kan Pacific Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012) ("When a term goes

undefined in a statute, we give the term its ordinary meaning.").  In common parlance, "funds" is

a flexible term encompassing virtually any liquid form of value.  The Oxford English Dictionary,

for example, defines "funds" to mean "money at a person's disposal; pecuniary resources."

Oxford English Dictionary (2d ed. 1989).  The term "pecuniary" is defined in turn as "of or

relating to money; monetary; financial."  *Id.*  Other dictionaries provide similarly broad

definitions.  *See, e.g.*, Random House Dictionary (4th ed. 2001) (defining "funds" as "money

immediately available; pecuniary resources"); Merriam-Webster Online, http://www.merriam-

webster.com/dictionary/fund (last visited June 29, 2016) (defining "funds" as "available

pecuniary resources," and "fund" as "available money" or "an amount of something that is

available for use:  a supply of something"); *see also* Black's Law Dictionary 743 (9th ed. 2009)

(defining "fund" as "a sum of money or other liquid assets established for a specific purpose,"

and further defining "money" as "[a]ssets that can be easily converted to cash.").

Relying on these definitions, courts have consistently concluded that Section 1960

applies not just to traditional currencies, but also to virtual currencies, including Bitcoin, because

virtual currencies constitute "funds."[3]  Beginning in 2007, e-Gold, an issuer of digital currency

known as "e-gold," was charged with, *inter alia*, operating an unlicensed money transmitting

business in violation of Section 1960(b)(1)(B).  *See United States* v. *E-Gold, Ltd.*, 550 F. Supp.

---

[3]     Murgio's argument that reading "funds" under 1960 to include Bitcoins would render the
statute "an absurdity," (Murgio MTD Br. 8), is itself absurd.  What sets Murgio's list of
commodities, collectables, and other items apart from Bitcoin is that unlike, say, soybeans,
orange juice, baseball cards, or fancy cars (*see* Murgio MTD Br. 8-9, 11), "the only value for
Bitcoin lies in its ability to pay for things—it is digital and has no earthly form; it cannot be put
on a shelf and looked at or collected in a nice display case."  *Ulbricht*, 321 F. Supp. at 570.
Because its only cognizable value is its use as funds—an anonymous substitute for payment in
the marketplace—Bitcoin (and other virtual currencies) fall precisely within the ambit of what
Section 1960 was designed to address.  Whether these other examples Murgio lists in his motely
parade of horribles also constitute "funds" is a question not presented here.

2d 82, 82 (D.D.C. 2008).  The defendant sought to dismiss the charge on the ground that Section

1960 only reaches those who "deal in cash or currency."  *Id.*  Firmly rejecting the argument, the

*E-Gold* court found that it was "clear" that the text of Section 1960 reached virtual currency, as

the statute "defines 'money transmitting' broadly to include transferring 'funds,' not just

currency, by 'any and all means;' it is not limited to cash transactions."  *Id.* at 88.  In other

words, under *E-Gold*'s holding, "funds" includes not only traditional fiat currency, but also

virtual currency, including both e-Gold and Bitcoin.  (*Cf.* Murgio MTD Br. 5 ("Bitcoins are, in

essence, digital gold.")).

    In 2014, Judge Rakoff reached the same conclusion in a Bitcoin prosecution under

Section 1960, concluding that "Bitcoin clearly qualifies as 'money' or 'funds' under [the] plain

meaning definitions" of the term, because "Bitcoin can be easily purchased in exchange for

ordinary currency, acts as a denominator of value, and is used to conduct financial transactions."

*United States* v. *Faiella*, 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2013) (concluding that a Bitcoin

exchanger "clearly qualifies as a 'money transmitter' for purposes of Section 1960").  Following

Judge Rakoff's lead, Judge Cote also concluded in the Liberty Reserve case that "LR," Liberty

Reserve's virtual currency, constitute "funds" for purposes of Section 1960.  *See United States* v.

*Budovsky*, No. 13 Cr. 368 (DLC), 2015 WL 5602853, at *14 (S.D.N.Y. Sept. 23, 2015).

    A plain reading of Section 1960 to include virtual currencies is consistent with the

statute's legislative history.  Congress crafted Section 1960 as an anti-money laundering statute

directed at money transmitting businesses, that was designed to address a "gaping hole in the

money laundering deterrence effort."  S. Rep. No. 101-460, at *11 (1990).  The statute was

amended thereafter based on Congress's concern that money transmitting businesses were

"frequently used in sophisticated schemes to transfer large amounts of money which are the

proceeds of unlawful enterprises." H.R. Rep. No. 103-438, at *6 (1994).  The House Resolution in support of the 1994 amendments to the Section expressly noted the purpose of the Section was to "establish a registration requirement" for such businesses "to assist the Secretary of the Treasury, the Attorney General, and other supervisory and law enforcement agencies to effectively enforce the criminal, tax, and regulatory laws and prevent such money transmitting businesses from engaging in illegal activities."  *Id.*  The House Report emphasized that there was a need to "establish uniform laws for licensing and regulating [money transmitting businesses] [f]or purposes of preventing money laundering and protecting the payment system from fraud and abuse." *See id.* at *5.

In 2001, Congress further amended Section 1960 to (1) make Section 1960 "a general intent crime for which a defendant is liable if he knowingly operates an unlicensed money transmitting business," without requiring proof that "the defendant knew that a State license was required or that the Federal registration requirements promulgated pursuant to 31 U.S.C. § 5330 applied to the business," H.R. Rep. 107-205(I), at *54 (2001); and (2) "expand[ ] the definition of an unlicensed money transmitting business to include a business engaged in the transportation or transmission of funds that the defendant knows are derived from a criminal offense, or are intended to be used for an unlawful purpose," *id.*

Thus, both the text of Section 1960 and its legislative history make plain that "Congress designed the statute to keep pace with such evolving threats, which is precisely why it drafted the statute to apply to any business involved in transferring 'funds . . . by any and all means.'" *Faiella*, 39 F. Supp. 3d at 546 (finding that Section 1960's legislative history supports application of the statute to Bitcoin); *cf. United States* v. *Ulbricht*, 31 F. Supp. 3d 540, 570 (S.D.N.Y. 2014)  (concluding that "[t]he money laundering statute [18 U.S.C. § 1956] is broad

enough to encompass use of Bitcoins in financial transactions.  Any other reading would—in

light of Bitcoins' sole raison d'etre—be nonsensical.").[4]  Murgio's argument that that "Congress

could not have contemplated [the] application [of Section 1960] to bitcoins" at the time it was

originally passed" (Murgio MTD Br. 9), is of no matter.   In rejecting this same argument in the

context of LR virtual currency, Judge Cote noted that "the fact that a statute can be applied in

situations not expressly anticipated by Congress does not demonstrate ambiguity.  It

demonstrates breadth."  *Budovsky*, 2015 WL 5602853, at \*14 (quoting *Hayden* v. *Pataki*, 449

F.3d 305, 357 (2d Cir. 2006)); *see also Barr* v. *United States*, 324 U.S. 83, 90 (1945) ("[I]f

Congress has made a choice of language that fairly brings a given situation within a statute, it is

unimportant that the particular application may not have been contemplated by the

legislatures.").

    Against this backdrop, the canons of statutory construction cited by Murgio—the rule of

lenity and the doctrine of constitutional avoidance—have no application here.  (*See* Murgio

MTD Br. 11-12).  "The Supreme Court has repeatedly stated that the rule of lenity is 'reserved

---

[4]      Murgio's assertion that since Section 1960 "was designed to stop the movement of
money tied to drug dealing, not other things," Bitcoin cannot be read to fall within its scope (*see*
Murgio MTD Br. 9), is also absurd.  Although Congress had particular concern with
"'prevent[ing] the movement of funds in connection with drug dealing,'" *Faiella*, 39 F. Supp. 3d
at 546 (quoting *United States* v. *Bah*, 574 F.3d 106, 112 (2d Cir. 2009); H.R. Rep. No. 170-
250(I)), the statute's broad use of the term "funds" and its inclusion of a prohibition of
transportation or transmissions of funds derived from criminal offenses or intended to be used for
criminal offenses—without limitation to narcotics trafficking—is evidence of Congressional
intent to cover all means by which criminal proceeds might be transmitted and laundered, not
just those derived from drug deals.  And in any event, it is precisely due to the fact that Bitcoin is
"an anonymous and untraceable form of payment" that it has been a choice vehicle through
which drug transactions, and the sale of other illicit goods and services, have been made, and
their profits laundered, in the digital age.  *See*, *e.g.*, *United States* v. *Ulbricht*, 31 F. Supp. 3d
540, 547 (S.D.N.Y. 2014) (describing Silk Road case as involving "conspir[acy] with narcotics
traffickers and hackers to buy and sell illegal narcotics and malicious computer software and to
launder the proceeds using Bitcoin").

. . . for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative history, and motivating policies of the statute." *Faiella*, 39 F. Supp. 3d at 547 (quoting *Moskal* v. *United States*, 498 U.S. 103, 108 (1990)); *see also Bifulco* v. *United States*, 447 U.S. 381, 387 (1980)); *United States* v. *Litchfield,* 986 F.2d 21 (2d Cir. 1993). It "comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers." *Callanan* v. *United States*, 364 U.S. 587, 596 (1961). Likewise, the doctrine of constitutional avoidance is available only when a court is faced with "competing plausible interpretations of a statutory text," one of which raises serious constitutional doubts and the other does not. *Clark* v. *Martinez*, 543 U.S. 371, 381 (2005). The doctrine thus "has no application in the absence of statutory ambiguity." *United States* v. *Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 494 (2001).

Here, "there is no such irreconcilable ambiguity requiring resort to the rule of lenity" in applying Section 1960 to Bitcoin. *Faiella*, 39 F. Supp. 3d at 547; *see also Budovsky*, 2015 WL 5602853, at *14 ("Having considered the text, purpose, and legislative history of § 1960, there is no ambiguity that would require resort to the rule of lenity."). Nor is there any reason to apply the doctrine of constitutional avoidance, in light of the fact that Murgio "does not point to any prior law that failed to apply § 1960 to virtual currencies, and thus does not explain how its application here represents an 'unforeseen and retroactive judicial expansion of narrow and precise statutory language.'" *Budovsky*, 2015 WL 5602853, at *14 (citing *Bouie* v. *City of Columbia*, 378 U.S. 347, 352 (1964)).[5]

---

[5]      Murgio is hardly in a position to claim surprise that virtual currency businesses are subject to federal registration requirements just like any other money transmitting business.

19

In support of his position that "virtual currency" does not fall within the statutory

definitions of "funds" because it is distinct from "real currency," Murgio relies upon discussions

of the term "currency" appearing in a Notice issued by the Internal Revenue Service ("IRS") and

in the FinCEN March 2013 Guidance (attached to Murgio MTD Br. as Ex. B).  (*See* Murgio

MTD Br. 10-11).  This argument gets Murgio nowhere.  As Judge Cote correctly recognized in

rejecting a similar argument, "[t]hese documents are inapposite and do not suggest that the term

'funds,'" as set forth in the statutory text of Section 1960, "should not be read to encompass

virtual currencies."  *Budovsky*, 2015 WL 5602853, at *14;[6] *cf. id.* at. *10 (noting that the

---

Murgio himself described Coin.mx as a site "for buying and selling" Bitcoin "like a transmitter
service," which would "offer[ ] margin trading as well as [have] the ability to transfer money in
and out of our member banks accounts [sic].  In the US the licenses would be broker dealer and
*money transmitting*."  (Murgio Compl. ¶ 14(a)(i) & n.1 (emphasis added)).  To the extent Murgio
raises any due process claims he cannot avail himself of such arguments because he was plainly
on *actual* notice of the licensing requirements.  *See Faiella*, 39 F. Supp. 3d at 547 (rejecting
defendant's argument, on motion to dismiss, that applying Section 1960 to virtual currency
business would constitute "*ex post facto* judicial lawmaking" given allegations in the case that
defendant was aware that the federal registration requirement applied to virtual currency
businesses); *see also United States* v. *Pfeiffer*, 371 F.3d 430, 437 (8th Cir. 2004) (rejecting
defendant's due process challenge to alleged vagueness of criminal statute based in part on clear
evidence in the record that defendant had "actual notice" that the statute covered his conduct).

[6]     Murgio's argument regarding FinCEN March 2013 Guidance's use of the term "funds" in
the context of "prepaid access" only further highlights his misapprehension of the regulatory
scheme.  (*See* Murgio MTD Br. 8-9).  As the court in *E-Gold* explained, "Section 1960's
reference to Section 5330 in Section 1960(b)(1)(B)," and the regulations promulgated
thereunder, does not "limit its scope to businesses that handle cash," both because "(1) Section
1960 does not borrow the definition of 'money transmitting business' from Section 5330, and (2)
Section 5330's definition of 'money transmitting business' is not limited to cash transactions, but
rather includes transmissions of funds by any means."  550 F. Supp. 2d at 89.  In any event, the
FinCEN March 2013 Guidance lends no support to Murgio's position.  Its explanation as to why
virtual currencies do not fall under the regulation's "prepaid access" exception to the definition
of money transmitter, *see* 31 C.F.R. § 1010.100(ff)(5)(ii)(E), (f)(7), has no bearing on the
question of whether Bitcoin is "funds" as used in Section 1960.  Indeed, as the FinCEN March
2013 Guidance explains, "prepaid access" is limited to "real currency," and not "virtual
currency," because the definition of "prepaid access" did not use the language "like that in the
definition of money transmission, which expressly includes the acceptance and transmission of

FinCEN March 2013 Guidance "observes that the definition of money transmitter contained in 31 C.F.R. § 1010.100(ff)(5) does not differentiate between real currencies and convertible virtual currencies" (quotation marks omitted)); *see also Ulbricht*, 321 F. Supp. 3d at 569 (concluding, in rejecting similar argument in context of Section 1957 money laundering, that "neither the IRS nor FinCEN purport to amend the money laundering statute (nor could they)").  And Murgio's citation to an order from the Commodity Futures Trading Commission which concludes Bitcoins are (also) a commodity (Murgio MTD Br. 11; Ex. A thereto), is similarly of no help, as its own definition of Bitcoin clearly falls within Section 1960's definition.  (*See* Murgio MTD Ex. A at 1 & n.2).

> **b.**   **The S3 Indictment Properly Alleges that Murgio Operated an Unlicensed  Money Transmitting Business**

Although unheeded by Murgio, Second Circuit case law makes plain that "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  *Stavroulakis*, 952 F.2d at 693 (internal citations omitted); *see also United States* v. *Vilar*, 729 F.3d 62, 80 (2d Cir. 2013).  That is precisely what Counts One and Two of the S3 Indictment do.  Both counts track the language of the criminal statute at issue—Section 1960(b)(1)(B)—by alleging that Murgio "knowingly did conduct, control, manage, supervise, direct, and own all or part of an unlicensed money transmitting business . . . to wit, Coin.mx," which "failed to comply with the money transmitting business registration requirements set forth in Title 31, United States Code, Section 5330, and the

---

'other value that substitutes for currency.'"  FinCEN March 2013 Guidance at 4 & n.18 (quoting 31 C.F.R. § 1010.100(ff)(5)(i)).

regulations prescribed thereunder." (S3 Indictment ¶¶ 12, 15).[7]  That is all that is required,

because under Second Circuit law, the Indictment need not set forth "the particulars of how a

defendant effected the crime," *D'Amelio*, 683 F.3d at 418, *i.e.*, the statutory or regulatory

provisions that Coin.mx violated by failing to register as a money transmitting business, or

precisely how Coin.mx functioned as a money transmitting business.  The violation of these

provisions by Coin.mx is already implicit in the Section 1960 charge, for "[a]n indictment must

be read to include facts which are necessarily implied by the specific allegations made."

*Stavroulakis*, 952 F.2d at 693; *see also United States* v. *Crispo*, 47 F. App'x 39, 42 (2d Cir.

2002) (holding that an indictment charging defendant with "extortion, a legal term of art, was

sufficient to charge him with the component parts of that term," and that the term's statutory

definition did not have to be "explicitly recited" in the indictment); *United States* v. *Watts*, No.

98 Cr. 1082 (DAB), 1999 WL 269868, at *4 (S.D.N.Y. May 4, 1999) ("The Indictment and

discovery, combined with the statutory definition of the term ['extortionate means'], provide

sufficient information to enable Defendants to prepare their defense, and the Government is not

---

[7]    Murgio attempts to distinguish the S3 Indictment from that in *United States* v. *Budovsky*,
No. 13 Cr. 368 (DLC), by arguing that Judge Cote "found the indictment was alleged sufficiently
because it identified the precise C.F.R. regulations, not simply § 5330." (Murgio MTD Br. 15
n.10).  Murgio selectively quotes from Judge Cote's opinion, which actually rejected the
defendant's argument that the indictment's "fail[ure] to identify a regulation pursuant to § 5313
that required Liberty Reserve to file a report with the Secretary of the Treasury" constituted
grounds for dismissal.  2015 WL 5602853, at *8.  Although Judge Cote acknowledged that the
*Budovsky* indictment did include two regulations under § 5330, Judge Cote also stated that "an
indictment need only allege a violation of § 5330's implementing regulations to sufficiently
allege a violation of 18 U.S.C. § 1960(b)(1)(B)."  *Id.* at *8.  Further, in rejecting the defendant's
argument that identification of the specific regulations was required, Judge Cote wrote that the
indictment "essentially tracks the language of § 1960 and provides the approximate time and
place of the crime, and that is all that is required in order to provide the defendant with adequate
notice of the offense with which he is charged.  Budovsky does not point to any authority which
requires an indictment to describe the entire regulatory regime encompassed by the criminal
statute."  *Id.* (*citing United States* v. *Vilar*, 729 F.3d at 80).  The same result obtains here.

required to provide information on how Defendants allegedly committed the crime."); *see generally Hamling*, 418 U.S. at 118-19 (holding that indictment need not allege the component parts of a legal term of art whose definition "does not change with each indictment").

The crux of Murgio's argument on this point is that Section 1960 requires that the Indictment allege that "Coin.mx transmitted bitcoins to another location or persons for its customers." (Murgio MTD Br. 15). This argument fails for a number of reasons. First, because the Indictment alleges that Coin.mx was an "unlicensed money transmitting business" as set forth in Section 1960(a), including by failing to comply with the requisite "registration requirements under Section 5330 of Title 31, United States Code, or the regulations prescribed under such section," *see* 18 U.S.C. § 1960(b)(1)(B), the Indictment is sufficiently pled as a matter of Second Circuit law. It need say no more. *See, e.g., Stavroulakis*, 952 F.2d at 693.

Second, Murgio's argument rests on a misrepresentation of the facts. Coin.mx was not simply a seller of Bitcoin as Murgio would have this Court believe. The Government expects the evidence at trial will demonstrate a variety of different ways Coin.mx operated as a money transmitter, beyond simply having sold Bitcoin to customers in two-party transactions. Such money transmitting functions included, among other things, (i) accepting funds in the form of U.S. currency from the public through wire transfers (*i.e.,* from a customer's bank account to Coin.mx's bank account), cash deposits, and credit and debit card transactions, in exchange for Bitcoin; (ii) transmitting Bitcoin to and from various Bitcoin wallets on Coin.mx and other Bitcoin wallet providers; and (iii) exchanging Bitcoin for U.S. currency on Coin.mx and transmitting the proceeds of those exchanges in the form of U.S. currency to various bank

accounts as directed by customers.[8]  Although these modes of transmission – particularly when

combined into a series of transactions by a customer  – clearly meet Murgio's cramped (and

incorrect) reading of the FinCEN regulations, the Government is not obligated to plead each and

every one of Coin.mx's money transmitting functions in the Indictment, *see, e.g., D'Amelio*, 683

F.3d at 418, and Murgio points to no authority to the contrary.[9]

Third, Murgio's argument rests on a faulty legal premise.  Specifically, Murgio misreads

the applicable FinCEN Regulations' definition of "money transmitter" in the implementing

regulations under the BSA, *see* 31 C.F.R. § 1010.100(ff)(5)(i).  Murgio quotes only the first part

---

[8]      As set forth in the Complaint, Coin.mx was an "international . . . exchange that allows
you to securely buy, use, and accept bitcoin and other digital currencies," and that accepts
"CASH, WIRE & BANK DIRECT" as well as "ALL CREDIT CARDS."  (Murgio Compl.
¶ 15).  The Complaint also provides specific examples of the types of money transmitting
functions in which Coin.mx engaged as part of its description of various undercover transactions
conducted on Coin.mx by law enforcement.  (*See id.* ¶ 17 (noting that after undercover Agent-1
exchanged U.S. currency for Bitcoin on Coin.mx, Agent-1 exchanged a portion of those Bitcoin
back to U.S. dollars, "which he successfully sent via wire transfer to, and then withdrew from, an
undercover bank account")).  The Complaint provides yet additional details on the money
transmitting functions of Coin.mx.  (*See, e.g., id.* ¶ 21(b) (noting that Coin.mx bank accounts
established "thousands of incoming deposits in varying amounts from individuals," as well as
"numerous payments to entities which . . . sell Bitcoins in exchange for U.S. dollars and other
currency"); *id.* ¶ 21(c) & n.4 (noting that Coin.mx was sending wire transfers to and from foreign
bank accounts into various domestic accounts, both to pay individual customers as well as to
exchange U.S. dollars for Bitcoin)).  *See generally Faiella*, 39 F. Supp. 3d 544 (relying on
allegations in Complaint in explaining how Bitcoin exchange functioned).

[9]      For similar reasons, Murgio's argument that because the term "business" is found in
Section 1960(a), the Indictment must allege that "a defendant s[old] money transmitting services
to others for a profit" (Murgio MTD Br. 14), also fails.  The assertion that the Indictment needs
to allege that Murgio turned a "profit" in order properly to allege a violation of Section 1960
reads into the statute a requirement that does not exist, either in the statutory text of 1960, nor in
the regulations promulgated thereunder.  Moreover, both the Indictment and the Murgio
Complaint make plain (and the Government expects the evidence will show at trial) that Murgio
did not operate Coin.mx as a charity.  Rather, every transaction made by customers of Coin.mx
resulted in a fee to Coin.mx (*see* S3 Indictment ¶ 3; Murgio Compl. ¶¶ 9, 17), including the
"generat[ion] of revenue for Coin.mx" as a result of its knowing facilitation of ransom proceeds
from victims of ransomware to the malware operators (S3 Indictment ¶ 9).  The S3 Indictment
and the Complaint both clearly allege that Coin.mx was a business—specifically, an unlicensed
money transmitting business (*see* S3 Indictment ¶¶ 4, 5, 6, 11, 12, 15, 31, 33).

of the relevant definition, *see id.* § 1010.100(ff)(5)(i)(A), which focuses on "money transmission services"; he ignores subsection (B) and, more specifically, its inclusion of "[a]ny other person engaged in the *transfer of funds*" without limitation as to the number of persons or locations involved. *Id.* § 1010.100(ff)(5)(i)(B) (emphasis added). Thus, even assuming, *arguendo*, that Coin.mx's sole function was to sell Bitcoin to the public in two-party transactions, rather than "transmit[ing] bitcoins to another location or person for its customers" as Murgio (incorrectly) asserts (Murgio Br. 15), Murgio's argument would still fail because the portion of the definition Murgio omits from his analysis still plainly applies to Coin.mx. Coin.mx obviously engaged in the "transfer of funds" – in the form of both Bitcoin and real U.S. currency – to effectuate even just its sales of Bitcoin to the public through the use of its Bitcoin wallets and its bank accounts. As such, Coin.mx was required to register as a money transmitter under Section 1960.

Only this full definition of "money transmitter" under 31 C.F.R. § 1010.100(ff)(5)(i) accords with the statutory breadth and purpose behind Section 1960's definition of "money transmitting." That statutory definition includes the act of "transferring funds on behalf of the public by any and all means," without requiring that the transfer of funds be from one location or person to another location or person. 18 U.S.C. § 1960(b)(2). Indeed, this view accords with Title 31, United States Code, Section 5330, which defines "money transmitting business" broadly to include any business that "provides . . . currency exchange *or money transmitting* or remittance services, . . . or *any other person who engages as a business in the transmission of funds*." 31 U.S.C. § 5330(d)(1) (emphasis added).

This interpretation also aligns with the FinCEN March 2013 Guidance, which specifically addresses virtual currency exchangers, including Bitcoin exchanges like Coin.mx. The FinCEN March 2013 Guidance, rather than announce any new rule requiring registration, merely clarified

the applicability of existing FinCEN regulations regarding money transmitters and money services businesses—including 31 C.F.R. § 1010.100(ff)(5)(i).  And it made plain that these regulations apply to businesses that deal with "convertible" virtual currencies, or virtual currencies that either have "an equivalent value in real currency, or act[ ] as a substitute for real currency," FinCEN March 2013 Guidance at 2, such as Bitcoin.  *See United States* v. *Lott*, 750 F.3d 214, 217 (2d Cir. 2014) (noting that agency interpretations do not "create new law, right[s], or duties," "but merely clarify an existing statute or regulation" (internal quotation marks omitted)); *Budovsky*, 2015 WL 5602853, at *10 (noting that the FinCEN March 2013 Guidance "did not create new law," but rather "merely clarif[ied] an existing statute or regulation" (*citing Lott*, 750 F.3d at 217)).  The FinCEN March 2013 Guidance clarifies that, under FinCEN regulations, "[a]n administrator or exchanger that (1) accepts and transmits a convertible virtual currency *or* (2) buys or sells convertible virtual currency for any reason is a money transmitter under FinCEN regulations."  FinCEN March 2013 Guidance at 2 (emphasis added); *see also id.* at 1 ("[A]n administrator or exchanger is an MSB [money services business] under FinCEN regulations, specifically, a money transmitter.").  In sum, these authorities make clear what is already plain from the text of Section 1960:  that a business like Coin.mx that buys or sells convertible virtual currency like Bitcoin—without more—functions as a money transmitting business subject to FinCEN registration requirements.

Against these statutory and regulatory definitions—each of which contain disjunctive conjunctions that Murgio's arguments fail to address—and the cases that have applied them to virtual currency exchanges, Murgio's strained and narrow reading of the term "money transmitter" finds no support.  Simply put, a Bitcoin exchange like Coin.mx falls under the auspices of Section 1960, Section 5330, and the regulations promulgated thereunder.  *See*

*Faiella*, 39 F. Supp. 3d at 546-57 (concluding that Bitcoin exchange business "clearly qualifies as a 'money transmitter' for purposes of Section 1960," citing both the regulatory definition of "money transmitter" and FinCEN March 2013 Guidance "specifically clarifying that virtual currency exchangers constitute 'money transmitters' under its regulations").  Because Counts One and Two allege that Murgio failed to register Coin.mx with FinCEN, they properly state an offense under Section 1960(b)(1)(B).

### c.      The Cases Cited By Murgio are Not to the Contrary

Murgio's cites various Second Circuit cases (*see* Murgio MTD Br. 17), but these do not advance his position.  Although these cases deal with circumstances in which the money transmitting businesses at issue transmitted funds from one person to another person or location, including in a traditional, Hawala-like fashion, *none* of them stand for the proposition that such businesses are the only businesses that fall under Section 1960's definition of "money transmitter."  *See United States* v. *Elfgeeh*, 515 F.3d 100, 108 (2d Cir. 2008) (quoting FBI testimony of agent explaining to jury that "[a] Hawala operates in a similar fashion to a Western Union business"); *United States* v. *Bah*, 574 F.3d 106, 110 (2d Cir. 2009) (describing Government's evidence in Hawala case).

Nor do any of the cases cited by Murgio support his assertion that transmission from one person or location to another is required under Section 1960.  For example, in *United States* v. *Banki*, 685 F.3d 99 (2d Cir. 2012), the Second Circuit concluded it was error for the district court not to have instructed the jury that a "business" requires more than a single transaction, and that the defendant's request to charge which so defined "business" was "legally correct."  *Id.* at 113 & n. 9.  It did not opine on other parts of the district court's instruction, including the correct proposition that a "money transmitting business" includes "any business which provides . . .

27

currency exchange or money transmitting or remittance services," without any limitation to the number of persons or locations involved. *Id.; see* 31 U.S.C. § 5330(d)(1); *see also United States* v. *Velastegui*, 199 F.3d 590, 592 (2d Cir. 1999) (defining money transmitting business in context of how corporation at issue operated).

Contrary to Murgio's contention, no different result is required by a fair reading of either *E-Gold* or *Faiella*. Although neither case dealt with an exchanger of virtual currency that functioned precisely like Coin.mx, *see E-Gold*, 550 F. Supp. 2d at 85 (describing defendant G & SR as providing services of "digital currency exchanger," while e-Gold functioned as "an alternative payment system"); *Faiella*, 39 F. Supp. 3d at 546 (describing Faiella's sale of Bitcoin and then transfer to customers' accounts on Silk Road), the statutory interpretations of Section 1960 that underlie the holdings in *E-Gold* and *Faiella* are equally applicable to Coin.mx. Moreover, the holdings in *E-Gold* or *Faiella* do not support the proposition that a pure Bitcoin seller—which Coin.mx was not—would not qualify under the statute; they simply do not address that question.

In sum, because the S3 Indictment sufficiently pleads that Murgio violated Section 1960(b)(1)(B) by failing to register Coin.mx with FinCEN, this Court should deny Murgio's motion to dismiss Counts One and Two.

### 2.    Murgio is Properly Charged Under 18 U.S.C. § 1960(b)(1)(A)

Murgio's corollary assertion that Coin.mx does not fall within the scope of the Florida statute's prohibition of unlicensed money transmitters is equally without merit. Murgio argues that the Florida statute does not cover two-party transmissions. (*See* Murgio MTD Br. 22). But Section 560.125(1) of the Florida Statutes provides that "[a] person may not engage in the business of a money services business or deferred presentment provider in this state unless the

28

person is licensed or exempted from licensure under this chapter," Fla. Stat. Ann. § 560.125(1), and the plain text of Section 560.103(23) only requires that the business "receive[ ] currency, monetary value, or payment instruments for the purpose of transmitting the same by any means," *id.* § 560.103(23). Neither section places any limitation on the party to whom the transmission is intended to be made, or the number of people or locations that must be involved. In any event, Bitcoin falls within the definitions of "monetary value" and "payment instrument" as defined by Florida statute, which on their face are broadly defined to include any "medium of exchange," *id.* § 560.103(21), and "electronic instrument, or other instrument, payment of money, or monetary value," *id.* § 560.103(29).

Faced with clear statutory language that undoubtedly encompasses Bitcoin, and with no authority to the contrary, Murgio urges this Court not to apply the Florida statute to his case as it would be "an unfortunate example of law enforcement applying statutes to new technology that the drafters of the statutes could not have contemplated or have intended." (Murgio MTD Br. 22). But by writing the statute for licensing of money transmitters to reach not only "currency" (which is defined narrowly to include domestic and foreign currency), but also "monetary value" and "payment instrument," both of which are defined broadly to encompass any "medium of exchange" or "instrument," the Florida legislature—like Congress in crafting Section 1960— contemplated that the State should have the authority to regulate money transmitters beyond those that deal with real currency.[10]

---

[10]    This basic tenet is also established by the fact that Florida authorities themselves have prosecuted virtual currency (including Bitcoin exchanges) for failure to register under these statutes, at least as early as 2010. *See*, *e.g.*, *In re E-Gold Ltd. et al.*, State of Florida Office of Financial Regulation, Administrative Proceeding No. 0342-M-09/09, 2010 WL 7506250, at *1 (Fla. Off. Fin. Reg. Sept. 20, 2010) (stipulation and consent agreement stating that "e-Gold Ltd." and its affiliates "operated an alternative payment/money transmission system" that was "not

In any event, Coin.mx would fall within the definition of money transmitter under the Florida statute even if this Court were to conclude that Bitcoin did not constitute either an item of "monetary value" or a "payment instrument."  That is because Coin.mx "receive[d] currency" in the form of U.S. dollars "for the purpose of transmitting the same by any means," be it to exchange real currency for bitcoins in order to transfer the bitcoins to another Bitcoin wallet, or from the exchange of Bitcoin into real currency for transmission into a bank account.  Fla. Stat. Ann. § 560.103(23).  As such, the Indictment sufficiently pleads that Murgio also violated Section 1960(b)(1)(A) by failing to obtain a license for Coin.mx as required under Florida law.

### 3. Counts One and Two Should Not Be Dismissed For An Independent Reason

Finally, even if this Court were to adopt Murgio's position with regard to 18 U.S.C. § 1960(b)(1)(A) and (B)—which it should not—there would be no reason to dismiss Counts One and Two of the S3 Indictment (or, relatedly, the money laundering counts alleged in Counts Eight and Nine (*see* Murgio MTD Br. 6 & n.4)).  Murgio is properly charged in both of these counts with also having violated 18 U.S.C. § 1960(b)(1)(C) by knowingly involving Coin.mx in the transportation and transmission of funds in furtherance of ransomware schemes.  (*See* Indictment ¶¶ 9, 12, 18).  Because Murgio does not take issue with Counts One and Two insofar as they allege that he violated Section 1960(b)(1)(C), those counts should not be dismissed.

---

licensed to do business in Florida as a money transmitter . . . under Chapter 560, Florida Statutes").  Further, in February 2014, Florida authorities criminally charged two individuals for having sold bitcoin to undercover police officers in exchange for cash.  *See State of Florida* v. *Michell Abner Espinoza*, No. F. 14-002923 (Fla. Miami-Dade Cir. Ct.); *State of Florida* v. *Pascal Reid*, No. 14-002935 (Fla. Miami-Dade Cir. Ct.).  These prosecutions, notably, are based simply on the sale of bitcoins to a customer, without third-party transmission.  *See*, *e.g.*, Complaints in No. 2014-00014071 (against both Espinoza and Reid).

## POINT II:  COUNT FIVE PROPERLY ALLEGES
## A VIOLATION OF 18 U.S.C. § 215(a)(2)

Gross moves for dismissal of Count Five on the ground that the S3 Indictment "fails to allege the essential elements of 18 U.S.C. § 215" and because "it offers no assurances that [Gross] will be tried based upon evidence presented to the grand jury."  (Gross Br. 7).  Gross's motion is meritless.  A fair reading of the S3 Indictment shows not only that Count Five properly tracks the language of 18 U.S.C. § 215(a)(2), but contains more than sufficient factual detail to provide Gross with adequate notice of the charge to be proven against him at trial.

### A.      Applicable Law

The bank bribery statute, *see* 18 U.S.C. § 215, provides, in pertinent part, that whoever "as an officer . . . of a financial institution . . . corruptly accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business or transaction of such institution" is guilty of a felony.  18 U.S.C. § 215(a)(2).  To prove a violation of Section 215(a)(2), the following elements must be established:

> (1) the defendant is an officer or employee of a bank; (2) the bank is a financial institution as defined by Title 18, United States Code; (3) during the period charged, the defendant solicited, demanded, accepted or agreed to accept something of value, either for his own benefit or the benefit of another; and (4) the defendant took this action knowingly and corruptly, and with the intent to be influenced or rewarded in connection with a transaction of the financial institution.

*United States* v. *Carrizo*, No. 95 Cr. 779 (HB), 1996 WL 208186, at *3 (S.D.N.Y. Apr. 26, 1996); *accord United States* v. *Denny*, 939 F.2d 1449, 1450 (10th Cir. 1991) (setting forth similar elements for violation of Section 215(a)(2)); *see also United States* v. *McElroy*, 910 F.2d 1016, 1022 (2d Cir. 1990) (explaining essential elements of a violation of Section 215(a)).

With respect to the term "corruptly" as used in Section 215(a), the Second Circuit has stated:

> The term "corruptly" is ordinarily understood as referring to "acts
> done voluntarily and intentionally and with the bad purpose of
> accomplishing either an unlawful end or result, or a lawful end or
> result by some unlawful method or means. The motive to act
> corruptly is ordinarily a hope or expectation of either financial gain
> or other benefit to oneself or some profit or benefit to another."

*McElroy*, 910 F.2d at 1021 (quoting *United States* v. *Brunson*, 882 F.2d 151, 154 n.2 (5th Cir.

1989) (internal quotation marks and brackets omitted); *accord Stichting Ter Behartiging Van de*

*Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V.* v. *Schreiber*, 327 F.3d

173, 182 (2d Cir. 2003) ("We have also, in the context of the federal statute criminalizing the

bribing of agents of financial institutions, approved jury instructions providing that a person acts

'corruptly' if he or she acts with a 'bad purpose.'" (quoting *McElroy*, 910 F.2d at 1026) (footnote

omitted)); *cf. United States* v. *Bonito*, 57 F.3d 167, 171 (2d Cir. 1995) (approving of similar jury

instruction on the meaning of "corrupt" for purposes of the analogous federal programs bribery

statute, *see* 18 U.S.C. § 666).

Other circuit courts have approved of similar definitions of the term "corruptly" as used

in Section 215(a). *See United States* v. *Jordan*, 560 F. App'x 945, 948 (11th Cir. 2014)

(defining "corruptly" as meaning "that the defendant 'voluntarily and deliberately engaged in

unlawful conduct'" (citation omitted)); *Denny*, 939 F.2d at 1451 ("'An act is done "corruptly"

under this bank bribery statute if it is performed voluntarily and deliberately and performed with

the purpose of accomplishing either an unlawful end or result or accomplishing some otherwise

lawful end or lawful result by any unlawful method or means.'" (quoting 2 E. Devitt, C.

Blackmar & K. O'Malley, Fed. Jury Practice and Instr. § 26.08 (4th ed. 1990))).

**B.      Discussion**

The allegations in Count Five of the S3 Indictment are sufficient because they properly

set forth all of the essential elements of a violation of Section 215(a)(2) and provide Gross with

the approximate dates and locations of his crime.  Count Five states:

> From at least in or about May 2014 through at least in or about 2015, in the
> Southern District of New York and elsewhere, TREVON GROSS, the defendant,
> as an officer, director, employee, agent, and attorney of a financial institution, did
> corruptly solicit and demand for the benefit of a person, and corruptly accepted
> and agreed to accept, a thing of value from a person, to wit, a sum of money
> greater than $1,000, with the intent to be influenced and rewarded in connection
> with a business and transaction of such institution, *to wit*, HOPE FCU.

(S3 Indictment ¶ 23).  Other than Gross's argument that the S3 Indictment fails adequately to

particularize how Gross acted "corruptly," he does not take exception to the pleading of Count

Five.

In addition to the statutory allegations, Count Five incorporates by reference facts set

forth elsewhere in the S3 Indictment (*see id.* ¶ 22), which provide additional details concerning

the illegal *quid pro quo* arrangement with which Gross is charged.  *See* Fed. R. Crim. P. 7(c)(1)

("A count may incorporate by reference an allegation made in another count.").  Thus, the S3

Indictment alleges that (1) Gross was "the Chairman of the Board of Directors of [HOPE FCU],

a New Jersey-based credit union with primarily low-income members" (*id.* ¶ 2); (2) "[i]n

approximately 2014, . . . [Gross] allowed and assisted [Murgio], Michael J. Murgio, Lebedev,

and their co-conspirators to take control of HOPE FCU in exchange for bribes" (*id.* ¶ 10);

(3) "Gross directed [Murgio] and Michael J. Murgio to pay [the bribes] to bank accounts under

Gross's control" (*id.*); (4) "[Murgio] and his co-conspirators, at Gross's direction, paid over

$150,000 in bribes to bank accounts under Gross's control" (*id.*); (5) "Gross, in turn, spent

proceeds from the bribes on personal expenses, including payments on his personal credit cards"

(*id.*); (6) "with Gross's assistance, [Murgio] installed his co-conspirators, including Lebedev, on

the Board of HOPE FCU and transferred Coin.mx's banking operations to HOPE FCU" (*id.*);
and (7) "[Murgio], Lebedev, and their co-conspirators operated HOPE FCU as a captive bank for
their unlawful Bitcoin exchange until at least late 2014" (*id.*).

Further particulars of the bribery scheme are set forth in the portion of the S3 Indictment
describing the overt acts taken by Gross's co-defendants in furtherance of the bribery scheme.
These allegations include: (1) that "in or about April 2014, [Murgio] and Michael J. Murgio . . .
communicated with [Gross] in an effort to take over control of the Board of HOPE FCU" (S3
Indictment ¶ 19(a)); (2) that in the same month, "Michael J. Murgio . . . executed an agreement
on behalf of 'Collectables Club' with [Gross], on behalf of HOPE FCU, stating, among other
things, that individuals chosen by the 'Collectables Club' would be nominated for positions on
the Board of HOPE FCU" (*id.* ¶ 19(b)); and (3) that "[o]n or about November 22, 2014,
[Murgio], Michael J. Murgio, Lebedev, and other individuals met with Gross and discussed the
payment of an additional $50,000 bribe to induce Gross to relinquish control of HOPE FCU" (*id.*
¶ 19(g)).  The S3 Indictment also provides the approximate dates and amounts of the payments
that Gross received in bank accounts under his control from Murgio and his co-conspirators.
(*See id.* ¶ 19(c), 19(d), 19(e), 19(h) and 19(j)).

Taken together, the detailed allegations in the S3 Indictment concerning Gross's violation
of Section 215(a)(2) are more than sufficient to advise Gross of "the 'core of criminality' to be
proven against him." *Pagan*, 721 F.2d at 27 (citation omitted).  Count Five clearly "contains the
elements of the offense charged and fairly informs [Gross] of the charge against which he must
defend, and . . . enables him to plead an acquittal or conviction in bar of future prosecutions for
the same offense." *Alfonso*, 143 F.3d at 776 (internal quotation marks omitted).  Not only do the
allegations in Count Five "track the language of the statute charged and state the time and place

34

(in approximate terms) of the alleged crime," *Walsh*, 194 F.3d at 44, but the S3 Indictment sets forth a detailed description of the *quid pro quo* bribery scheme in which Gross is alleged to have taken part.

Notwithstanding these detailed allegations, Gross contends that Count Five should be dismissed because "the meaning of the term 'corruptly' is sufficiently uncertain and ambiguous that it is not enough to merely track the language of the statute in the Indictment." (Gross Br. 8). Gross is mistaken. Like other scienter elements often contained in criminal statutes, such as "willfully" or "knowingly," it is sufficient for purposes of pleading a violation of Section 215(a)(2) for the indictment to allege that the defendant acted "corruptly" and "with the intent to be influenced," which Count Five indisputably does. Whether Gross acted "corruptly" as alleged in the S3 Indictment – just as whether he acted "with the intent to be influenced," an element with which Gross notably does not take issue – is a question of *fact* for the jury to decide based upon all of the evidence adduced at trial and the Court's legal instructions. *See Morissette* v. *United States*, 342 U.S. 246, 274 (1952) ("Where intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury."); *United States* v. *Speare*, 297 F.2d 408, 410 (2d Cir. 1962) ("The question of whether criminal intent is inferable from the facts proved is a question for the jury."). At this stage, it is unnecessary for the S3 Indictment to allege all of the facts and circumstances that prove Gross acted "corruptly" as long as the pleading fairly informs Gross of the charge against him, which it does.

Gross misleadingly asserts, without citing *any* actual authority, that the "Second Circuit has recognized [that] the term 'corruptly' does not 'fully, directly, and expressly, without any uncertainty or ambiguity' set forth all the elements necessary to constitute the offense." (Gross Br. 8 (quoting *Russell* v. *United States*, 369 U.S. 749, 765 (1962))). In fact, the Second Circuit

35

has held just the opposite.  In *McElroy*, where the Second Circuit considered a constitutional

vagueness challenge to Section 215(a), the court observed that "[t]he conduct prohibited by

§ 215(a), which is limited to acts that are done 'corruptly,' is described in sufficiently plain terms

to permit an ordinary person to understand what conduct is prohibited."  910 F.2d at 1021.[11]

Other circuit courts have similarly held that the text of Section 215(a), including the term

"corruptly," is not ambiguous.  *See United States* v. *Nelson*, 712 F.3d 498, 512 (11th Cir. 2013)

("[T]he term 'corruptly' has a commonly understood meaning."); *United States* v. *Brunson*, 882

F.2d 151, 154 (5th Cir. 1989) ("The text of section 215 is not ambiguous. The statute plainly sets

forth the conduct that it prohibits and the scope of its coverage. Persons of ordinary intelligence

will understand how to conform their conduct to the law.").  Because the meaning of "corruptly"

in Section 215(a)(2) is not ambiguous as a matter of law, and Count Five properly alleges that

Gross acted "corruptly" in receiving payments from Murgio, Gross's motion to dismiss must fail.

Gross tries to inject uncertainty into the facially sufficient allegation that he acted

"corruptly" in Count Five by pointing to Supreme Court's decision in *Russell* v. *United States*,

369 U.S. 749 (1962).  (Gross Br. 8).[12]  In *Russell*, the defendants were charged under a provision

---

[11]     The Second Circuit's decision in *Schreiber*, 327 F.3d 173, upon which Gross also relies (*see* Gross Br. 8), is not to the contrary.  In *Schreiber*, the Second Circuit considered the meaning of the term "corruptly" as used in the Foreign Corrupt Practices Act ("FCPA"), *see* 15 U.S.C. § 78dd–2(a).  *See id.* at 181-82.  In concluding that in the context of the FCPA, the term "corruptly" means "a bad or wrongful purpose and an intent to influence a foreign official to misuse his official position," the court, in fact, looked to its earlier interpretation of "corruptly" as used in other bribery statutes, including Section 215(a).  *See id.* at 182 ("We have also, in the context of the federal statute criminalizing the bribing of agents of financial institutions, approved jury instructions providing that a person acts 'corruptly' if he or she acts with a 'bad purpose.'" (quoting *McElroy*, 910 F.2d at 1026)) (footnote omitted).  Thus, Gross's reliance upon *Schreiber* is also unavailing.

[12]     Gross also relies upon two Second Circuit cases (*see* Gross Br. 7-8), neither of which is apposite.  First, Gross cites *United States* v. *Foley*, 73 F.3d 484 (2d Cir. 1996), for the unremarkable proposition that when "one element of the offenses is implicit in the statute, rather

of Title 2 of the United States Code, *see* 2 U.S.C. § 192, which made it a crime for a witness

before a Congressional committee to refuse to answer questions pertinent to the subject matter of

the committee's inquiry. *See* 369 U.S. at 752. The case arose out of the McCarthy-era hearings

of the Committee on Un-American Activities of the House of Representatives and the Internal

Security Subcommittee of the Senate Judiciary Committee. *See id.* at 752 n.3. The Supreme

Court held that the indictments were insufficient because they failed to specify the subject matter

of the congressional inquiry in question. *See id.* at 771-72.

Gross's reliance on *Russell* is misplaced. As the Second Circuit has observed, *Russell* is

unique because it "is one of the very rare cases in which an indictment that tracked the statutory

language and furnished the pertinent dates was held insufficient." *Stringer*, 730 F.3d at 125.

"[I]t is clear that the Supreme Court's decision in *Russell* must be seen as addressed to the

special nature of a charge of refusal to answer questions in a congressional inquiry and not as a

broad requirement applicable to all criminal charges that the indictment specify how each

essential element is met." *Id.* at 125–26. Indeed, since *Russell*, the Supreme Court has refused

invitations by defendants to extend *Russell*'s holding, as Gross urges here, to other criminal

---

than explicit" it must be alleged in the indictment. *Id.* at 488, *abrogated on other grounds*,
*United States* v. *Santopietro*, 166 F.3d 88, 92-93 (2d Cir. 1999). Here, the term "corruptly" is an
explicit, rather than implicit, element of a violation of Section 215(a)(2) and is properly alleged
in Count Five. Second, Gross relies upon the "elementary principle of criminal pleading"
discussed in *United States* v. *Rosenblatt*, 554 F.2d 36 (2d Cir. 1977), that "where the definition
of an offense . . . 'includes generic terms, it is not sufficient that the indictment shall charge the
offense in the same generic terms as in the definition; but it must state the species, it must
descend to particulars." *Id.* at 41 (quoting *United States* v. *Cruikshank*, 92 U.S. 542, 558
(1875)). In *Rosenblatt*, the Second Circuit "reject[ed] the argument that the phrase 'conspiracy
to defraud the United States'" – as used in the general conspiracy statute, *see* 18 U.S.C. § 371 –
is sufficient, without more, to define the 'central' nature of the conspiratorial plan" in an
indictment. *Id.* But unlike the "broad, generic terms" used in Section 371, *id.,* the Second
Circuit has held that the term "corruptly," like the other terms used in Section 215(a), is
"sufficiently plain . . . to permit an ordinary person to understand what conduct is prohibited."
*McElroy*, 910 F.2d at 1021. Accordingly, neither *Foley* nor *Rosenblatt* is of any force here.

statutes. *See, e.g.*, *United States* v. *Resendiz-Ponce*, 549 U.S. 102, 109-11 (2007) (declining to extend *Russell* to indictment that charged attempted illegal reentry, in violation of 8 U.S.C. § 1326(a), but failed to specify an overt act).

The Second Circuit has explained that the message of the Supreme Court's decisions in cases like *Russell* and *Resendiz-Ponce* "is that for certain statutes specification of how a particular element of a criminal charge will be met (as opposed to categorical recitation of the element) is of such importance to the fairness of the proceeding that it must be spelled out in the indictment, but there is no such universal requirement." *Stringer*, 730 F.3d at 126. Such statutes include those involving false statements, the filing of false tax returns, and the distribution of controlled substances, all of which the Second Circuit has explained require further factual specification to provide proper notice to a defendant of the charge against which he must defend. *See id.* at 126-27. But that is not the case here. No such factual particularization is necessary in pleading that Gross acted with the requisite scienter – here, "corruptly" and "with the intent to be influenced"– in order adequately to inform him of the nature of the charge against him.

Indeed, in *United States* v. *Brunson*, 882 F.2d 151 (5th Cir. 1989), the Fifth Circuit rejected a similar argument that the indictment was insufficient because the term "corruptly" in Section 215(a) imposes a heightened pleading requirement. In *Brunson*, the defendant, who was a director of a bank in Louisiana, was charged with violating Section 215(a)(2) based upon his requests that a female customer who owed the bank money provide sexual favors in return for the defendant's assistance in deferring or eliminating the customer's debt. *See id.* at 153. The Fifth Circuit summarized the pertinent allegations in the indictment against Brunson as follows:

> that Brunson was a director and attorney of the bank, that he corruptly solicited and demanded sexual favors from Grayson for himself and others, in exchange for which he would be influenced concerning repayment of Grayson's overdrawn checking account.

*Id.*  In seeking dismissal of the indictment, the defendant argued that the term "corruptly" in

Section 215(a) "reflects an intent to require a high level of intent of an offender."  *Id.* at 154.

The Fifth Circuit rejected this claim.  The court observed that "corruptly" was added to the

statute in 1986 simply "to make it clear that section 215 was not so broad that it would reach 'all

kinds of otherwise legitimate and acceptable conduct.'"  *Id.*  (quoting H.R. Rep. No. 335, at 3,

*reprinted in* 1986 U.S.C.C.A.N. 1782, 1784).  Accordingly, the Fifth Circuit held that "[t]he

district court correctly denied defendant's motion to dismiss the indictment because it alleged all

of the requisite elements of the offense and charged an offense under section 215."  *Id.*  Because

Count Five of the S3 Indictment alleges all of the essential elements of a violation of Section

215(a)(2), the same result should obtain here.

Gross also argues that Count Five is insufficient because the S3 Indictment contains "no

allegations that he engaged in any voluntary or intentional conduct 'with the bad purpose of

accomplishing either an unlawful end or result, or a lawful end or result by some unlawful

method or means.'"  (Gross Br. 10 (quoting *McElroy*, 910 F.2d at 1021)).  In particular, Gross

argues that "there are no allegations that [he] had any knowledge of [Murgio's] unlawful purpose

[in trying to take over HOPE FCU], or any intention of furthering its unlawful end."  (*Id.*).  This

argument is a red herring.  The language in *McElroy* upon which Gross relies is derived from a

district court's jury instructions as to the meaning of "corruptly" in Section 215(a).  *See* 910 F.2d

at 1021.  Contrary to Gross's contention, the Second Circuit's definition of the term "corruptly"

in *McElroy* does not create additional "essential elements" that the Government must allege in an

indictment or prove at trial.  (*See* Gross Br. 10).  *Cf. United States* v. *Medley*, 913 F.2d 1248,

1261 (7th Cir. 1990) (failure to use the word "corrupt" in indictment or jury instruction in

Section 666 case not plain error where jury was told that defendant must have accepted or agreed

to accept payment intending to be influenced or rewarded in his official conduct).  As noted above, whether Gross acted "corruptly" in agreeing to accept and accepting bribes from Murgio and his co-conspirators in exchange for turning over control of HOPE FCU is a *factual* question for the jury to determine based upon the evidence adduced at trial and the reasonable inferences drawn therefrom.

In any event, the S3 Indictment provides sufficient factual detail to inform Gross of how he is alleged to have acted "corruptly" as charged in Count Five.  Indeed, the fundamental premise of Gross's motion—that he does not understand in what way he acted "corruptly" insofar as he took bribes in exchange for turning over control of HOPE FCU to Murgio—is preposterous.  Fairly read, the S3 Indictment alleges that Gross, as "Chairman of the Board of Directors of HOPE FCU, allowed and assisted [Murgio], Michael J. Murgio, Lebedev, and their co-conspirators to take control of HOPE FCU in exchange for . . . over $150,000 in bribes," which "Gross, in turn, spent  . . . on personal expenses, including payments on his personal credit card" (S3 Indictment ¶ 10).  As part of this *quid pro quo* arrangement – which resulted in Gross receiving a direct personal monetary benefit – Gross entered into an agreement "on behalf of HOPE FCU, stating, among other things, that individuals chosen by the 'Collectables Club' would be nominated for positions on the Board of HOPE FCU" (*id.* ¶ 19(b)), and, in fact, "assist[ed]" Murgio to "install[] his co-conspirators, including Lebedev, on the Board of HOPE FCU" (*id.* ¶ 10).  Gross's decision to assist Murgio and his co-conspirators to take control of HOPE FCU, and the concrete steps Gross took to install Murgio's hand-picked members on the

Board, in exchange for over $150,000 in personal payments from Murgio, is quintessential "corrupt" conduct that Section 215(a) was intended to address.[13]

Gross makes several other arguments, none of which have merit.  First, Gross points to the 1986 amendment to Section 215(a) by which Congress added the term "corruptly" in order to ensure that the statute would not reach "otherwise legitimate conduct."  (Gross Br. 9 (quoting H.R. Rep. No. 99-335, at 1, 1986 U.S.C.C.A.N. 1782, 1782); *see also id.* at 13).  *See* 18 U.S.C. § 215(c) (stating that "[t]his section shall not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.").  Notably, Gross does not assert that the bribe payments he received from Murgio fell within the Section 215(c) safe harbor for "bona fide" remuneration.  Even if Gross were to make this assertion, whether the payments were "bona fide" is a factual issue for the jury to decide at trial, not a legal question to be determined by the Court on a pretrial motion to dismiss.  *See Alfonso*, 143 F.3d at 777 (stating that where a question raised by the defendant on a pretrial motion to dismiss is "intermeshed with questions going to the merits, the issue should be determined at trial"); *see also United States* v. *Perez*, 575 F.3d 164, 166 (2d Cir. 2009) ("The Defendants, however, had no basis to challenge the sufficiency of the indictment before trial because it met the basic pleading requirements and was valid on its face. The defect of which the Defendants complain is

---

[13]      Courts in this and other Circuits have upheld convictions under Section 215(a) where the evidence showed that the defendant acted "corruptly" by entering into similar *quid pro quo* arrangements as the one alleged here.  *See, e.g.*, *McElroy*, 910 F.2d at 1021 (upholding Section 215(a)(1) and (a)(2) convictions of defendant bank officers where "[e]ach granted the other large, unsecured, improvident bank loans in order to receive large unsecured loans from the other's bank"); *Jordan*, 560 F. App'x at 948 (concluding the defendant "voluntarily and deliberately engaged in prohibited conduct when he knowingly agreed to share [a] referral fee and intentionally wrote the check to [the bank loan officer]"); *Brunson*, 882 F.2d at 155 (upholding Section 215(a)(2) conviction where defendant bank director solicited sexual favors in exchange for his help "obtaining time for [a bank client] to repay [an] overdrawn account").

the sufficiency of the Government's proof of the elements of the offense it chose to charge in the indictment.").  In any event, the allegations in the S3 Indictment that Murgio – who had no official position at HOPE FCU – paid Gross over $150,000 in "bribes," which Gross spent on "personal expenses," are sufficient to show that the payments in question were not "bona fide."

Second, Gross argues that "[t]here is nothing inherently corrupt or unlawful about placing the names of individuals in nomination for a position on the Board of Directors of a credit union."  (Gross Br. 11).  Gross's attempts to parse the S3 Indictment's allegations and read each in a vacuum are misleading and, ultimately, unavailing.  Gross's argument ignores the other allegations, including that Gross's nomination of individuals selected by Murgio to the HOPE FCU Board HOPE FCU was part of the charged *quid pro quo* scheme by which Gross received over $150,000 in bribes in exchange for taking the alleged Board actions.  Similarly, Gross asserts that "there are no allegations that any laws, regulations, policies, procedures, or duties were violated in the nomination or election of these individuals to the Board."  (*Id.*).  Gross identifies no authority, however, for the proposition that in alleging a violation of Section 215(a), an indictment must also enumerate all of the other laws, regulations, or common-law fiduciary duties that a defendant violated in acting "corruptly."  Instead, these are factual issues for the jury to decide based upon the evidence at trial.

In any event, it is reasonable to infer from the facts alleged in the S3 Indictment that, at a minimum, Gross misused his position as Chairman of the Board and violated the fiduciary duties he owed to HOPE FCU and its members.  *See Stavroulakis*, 952 F.2d at 693 ("An indictment must be read to include facts which are necessarily implied by the specific allegations made."). [14]

---

[14]     Gross's reliance on *United States* v. *Rooney*, 37 F.3d 847 (2d Cir. 1994), is misplaced.  In *Rooney*, the Second Circuit reversed the defendant's conviction for federal program bribery

In a nutshell, the S3 Indictment alleges that while he was the "Chairman of the Board of Directors" Gross accepted "over $150,000 in bribes," which he "spent . . on personal expenses," in exchange for allowing others "to take control of HOPE FCU" (S3 Indictment ¶ 10).  It is difficult to imagine a more egregious breach of fiduciary duty by an officer of a federal credit union than facilitating a takeover of the financial institution for personal profit.  Although Gross quibbles with the use of the term "bribes" because the S3 Indictment does not also explicitly "allege an intended violation of a known duty" (Br. 12), such a violation is implicit in the S3 Indictment's invocation of the term "bribes."  *See, e.g.*, *Resendiz-Ponce*, 549 U.S. at 107 (holding that indictment charging "attempted" illegal reentry was sufficient because it "implicitly alleged that respondent engaged in the necessary overt act simply by alleging that he 'attempted to enter the United States'" (internal quotation marks omitted)); *see also United States* v. *Zacher*, 586 F.2d 912, 916 (2d Cir. 1978) ("[W]hether they view it as a term of art or a term of common usage, courts have consistently understood the word 'bribe' to encompass acts that are Malum in se because they entail either a breach of trust or duty or the corrupt selling of what our society deems not to be legitimately for sale[.]").

In light of the foregoing, Gross's reliance upon *United States* v. *Pirro*, 212 F.3d 86 (2d Cir. 2000), is misplaced.  (*See* Gross Br. 13-14).  In *Pirro*, the Second Circuit found that the indictment failed adequately to state an offense for filing a false tax return, *see* 26 U.S.C. § 7206(1), because "[t]he indictment allege[d] the omission of a fact that [the defendant] might

---

under Section 666 because it found that there was no evidence that "he violated [any] official or public duty owed to the government or the public at large." *Id.* at 854.  Here, as the S3 Indictment alleges and as the Government expects the evidence will show at trial, Gross was the Chairman of the Board of Directors of HOPE FCU, a position that clearly imposes upon Gross fiduciary duties to the credit union under the law.  *See generally* 12 C.F.R. § 701.4 (setting forth duties of federal credit union directors, including duty of good faith and duty of care).

not have been required to report" under the tax code. *Id.* at 95. Because the indictment failed to include "the crucial background fact that [gave] rise to the duty to disclose the fact that was omitted," the Second Circuit held that the indictment was insufficient. *Id.* at 93. By contrast, the S3 Indictment adequately sets forth all the essential elements of a violation of Section 215(a)(2), including the "crucial background fact" that Gross was serving as the "Chairman of the Board of HOPE FCU" when he received "over $150,000 in bribes" from Murgio "with the intent to be influenced" in his decision to allow Murgio and his co-conspirators to "take control of HOPE FCU." (S3 Indictment ¶¶ 10, 23). These allegations, and the reasonable factual inferences drawn therefrom, are more than sufficient to inform Gross of how he is alleged to have acted "corruptly" in violation of Section 215(a)(2).

Accordingly, Gross's motion to dismiss Count Five should be denied.

## POINT III:  A BILL OF PARTICULARS IS NOT WARRANTED

Gross and Lebedev each move for a bills of particulars. Specifically, Gross seeks a bill of particulars (1) "to clarify what laws or duties he is alleged to have intended to violate" (Gross Br. 15); and (2) "as to the basis for the basis for the government's assertion that he engaged in criminal conduct in the Southern District of New York" (*id.* at 16). Lebedev seeks a bill of particulars specifying (1) "the identity of the unindicted co-conspirators"; (2) "the dates, locations, and amounts of any allegedly corrupt payment *he* made to [Gross]"; and (3) the facts that "support venue in this District." (Lebedev Br. 5). Both applications should be denied.

### A.     Applicable Law

Federal Rule of Criminal Procedure 7(f) permits a defendant to move for a bill of particulars "in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling the defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense."

44

*United States* v. *Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam); *see also United States* v. *Torres*, 901 F.2d 205, 234 (2d Cir. 1990), *abrogated on other grounds by United States* v. *Marcus*, 628 F.3d 36, 41 (2d Cir. 2010). "A bill of particulars is not required unless 'the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" *United States* v. *Mahabub*, No. 13 Cr. 908 (AJN), 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014) (quoting *United States* v. *Chen*, 378 F.3d 151, 163 (2d Cir. 2004)). "Generally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *Bortnovsky*, 820 F.2d at 574; *see also Walsh*, 194 F.3d at 47 ("[A] bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means."); *Mahabub*, 2014 WL 4243657, at *2.

As this Court has observed, "[t]he purpose of a bill of particulars is to ensure that a defendant has the information necessary to prepare a defense, not to turn over all information that would aid the defendant." *Mahabub*, 2014 WL 4243657, at *2 (citing *United States* v. *Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001)). A bill of particulars is not "a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial, and the Government is not required to give information that would, in effect, give the defendant a preview of the Government's case before trial." *United States* v. *Thompson*, No. 13 Cr. 378 (AJN), 2013 WL 6246489, at *7 (S.D.N.Y. Dec. 3, 2013) (internal quotation marks, citation, and brackets omitted). Thus, the Government is not required to "particularize all of its evidence," *United States* v. *Cephas*, 937 F.2d 816, 823 (2d Cir. 1991), or "to disclose the manner in which it will prove the charges or preview its evidence or legal theory," *United States* v. *Muyet*, 945 F. Supp. 586, 599 (S.D.N.Y. 1996) (internal

45

quotation marks omitted).  "[T]he proper test in deciding whether a bill of particulars should be required of the Government is whether the bill of particulars is necessary for the defense, not whether it would aid the defendant in his preparation."  *Trippe*, 171 F. Supp. 2d at 240.

Applying these principles, courts in this District routinely deny motions for bills of particulars that are, at bottom, demands for additional details of the manner in which the offense was committed or how the Government intends to prove its case at trial.  *See, e.g.*, *United States* v. *Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (noting that Government may not be compelled to provide bill of particulars disclosing manner in which it will prove charges, manner in which defendant committed the crime charged, or a preview of Government's evidence or legal theories); *United States* v. *Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977) (rejecting request for bill of particulars regarding the names, dates and places for the entire case as "an attempt to discover the minutia of the Government's case").  Also routinely denied are demands for bills of particulars setting forth the identities of co-conspirators.  *See Trippe*, 171 F. Supp. 2d at 240 ("[D]emands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied."); *see also Torres*, 901 F.2d at 233-34 (upholding district court's denial of a bill of particulars where the defendant had requested, in part, "the identity of those other persons 'known and unknown' as alleged in . . . the indictment").

Whether to order the Government to file a bill of particulars lies "within the sound discretion of the district court."  *United States* v. *Zemlyansky*, No. 12 Cr. 171 (JPO), 2013 WL 2151228, at *36 (S.D.N.Y. May 20, 2013) (quoting *United States* v. *Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984)).  "When exercising this discretion, a court must consider the totality of the information available to the defendant—through the indictment, affirmations, and general pre-

46

trial discovery—to determine whether, in light of the charges that the defendant is required to answer, the filing of a bill of particulars is warranted." *Thompson*, 2013 WL 6246489, at *7 (internal quotation marks omitted); *accord Bortnovsky*, 820 F.2d at 574.

A Court must also take into consideration the fact that because "a bill of particulars confines the Government's proof to particulars furnished," it can "restrict unduly the Government's ability to present its case." *United States* v. *Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994); *see also Mahabub*, 2014 WL 4243657, at *2 (recognizing that "care must be taken" in deciding whether to order a bill of particulars because "[t]he government's presentation of evidence at trial is limited to the particulars contained in the bill"); *United States* v. *Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721, at *3 (S.D.N.Y. Jan. 23, 2009) ("The vehicle of a bill of particulars serves to inform a defendant of the nature of the charge, when he is otherwise insufficiently informed, and must not be misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches.").  Moreover, the Government's provision of particulars tantamount to an itemized preview of its proof creates the very real danger that a defendant will "tailor [his] testimony to explain away the Government's case." *Henry*, 861 F. Supp. at 1197.  These concerns animate the rule that "if the defendant has been given adequate notice of the charges against [him] and can prepare fully for trial with reasonably diligent efforts, the Government cannot be required to disclose additional details about its case." *Id.*

## B.    Discussion

### 1.    Gross's Motion for a Bill of Particulars Should Be Denied

A bill of particulars specifying "what laws or duties [Gross] is alleged to have intended to violate" (Gross Br. 15) in "corruptly" soliciting and receiving payments, as charged in Count Five, is unwarranted.  As discussed above, the S3 Indictment alleges all the essential elements of

47

a violation of Section 215(a)(2) and provides sufficient factual details for Gross to understand the nature of the charge against him.  There is no need for the S3 Indictment further to enumerate the specific "law, regulation, policy, procedure or other cognizable legal duty" (*id.*) that Gross violated when, as "the Chairman of the Board of HOPE FCU," he "corruptly" received "over $150,000 in bribes" from Murgio in exchange for turning over control of the credit union to Murgio and his co-conspirators.  (S3 Indictment ¶ 10, 23).

Gross's proffered reason for why a bill of particulars is necessary—that he is burdened with review of the voluminous Government discovery that has been produced relating to Bitcoin and that any other reason how he could have acted "corruptly" is "entirely unclear"—is absurd. (Gross Br. 15).  As counsel well knows, the Government's case against Gross does not turn on whether Gross "had any knowledge of any unlawful Bitcoin exchange scheme" or not.  (*Id.*). Rather, as can be reasonably inferred from the allegations in the S3 Indictment, the crux of the Government's case is that Gross violated the fiduciary duties he owed to the members of HOPE FCU as Chairman of the Board by accepting the alleged bribes from Murgio and his co-conspirators for his personal profit in exchange for allowing Murgio to install members of the "Collectables Club" who were loyal to Murgio onto the Board and to use HOPE FCU as Murgio's own captive bank.   (*See*, *e.g.*, Murgio Compl. ¶ 27).

In addition to the S3 Indictment, Complaints, discovery, and voluntary productions, the Government has also had direct communications with Gross's counsel about the Government's theory as to Count Five.  As the Government has explained to counsel on multiple occasions, it intends to establish at trial, among other things, that: (i) HOPE FCU was a modest credit union limited by its charter to serve only the (primarily low-income) members of its New Jersey community, as defined by its Field of Membership ("FOM"), and had little experience in ACH

processing; (ii) as a result of the bribes he received, and in direct violation of NCUA regulations, Gross allowed Murgio to install members onto the HOPE FCU Board who Gross knew did not fall within the FOM; (iii) Gross allowed a payment processor used by Coin.mx (as well as payday lenders and other high-risk businesses) to use HOPE FCU to process complex, high-risk Automatic Clearing House ("ACH") transactions, resulting in a sudden spike in transactions processed by HOPE FCU to over $30 million in a single month by October 2014; (iv) Gross allowed for this high volume of risky transactions to occur without adequate anti-money laundering policies or procedures in place; (v) Gross failed to disclose this *quid pro quo* arrangement to the NCUA; (vi) Gross and other individuals made multiple misrepresentations to the NCUA in furtherance of the arrangement; and (vii) Gross's actions undermined the safety and soundness of HOPE FCU and caused its financial deterioration, ultimately requiring the NCUA to place the credit union into conservatorship and liquidation.  (*See also* Murgio Compl. ¶¶ 27-28).[15]  In the face of the Government's document productions and its explanations to counsel as to its theory of the case against Gross, the assertion that the Government's theory is "entirely unclear" (Gross Br. 15) is disingenuous.

Gross's request for a bill of particulars as to venue should be denied as moot.  The Government bears the burden of proving, by a preponderance of the evidence, that the crime was committed in this district. *See United States* v. *Bala*, 236 F.3d 87, 95 (2d Cir. 2000).  Prior to trial, however, "it suffices for the government to allege with specificity that the charged acts support venue in this district."  *United States* v. *Martino*, No. 00 Cr. 389 (RCC), 2000 WL

---

[15]     While the Government need not – and does not – make a full proffer herein of the evidence it expects to present at trial concerning the bank bribery scheme (or any of the other crimes charged in the S3 Indictment), the Government proffers this evidence merely to demonstrate the frivolousness of Gross's motion to dismiss and request for bill of particulars.

1843233, at *1 (S.D.N.Y. Dec. 14, 2000) (citation omitted).  "When a federal statute defining an offense does not specify how to determine where the crime was committed," a court must "look to the nature of the crime alleged and the location of the act or acts constituting it."  *United States* v. *Rutigliano*, 790 F.3d 389, 395 (2d Cir. 2015) (internal quotation marks omitted).

Here, venue for Count Five lies in this District for at least two reasons.  First, as alleged in the S3 Indictment, and as further detailed in the bank and wire transfer records produced in discovery,  many of the bribe payments made by Murgio to Gross were "transferred via wire through the Southern District of New York" to Gross's bank account.  (S3 Indictment ¶ 19(c)).  The bribe payments that Gross solicited and received from Murgio, which passed through banks in Manhattan, "constituted essential, and not merely preparatory, steps" in the bribery offense.  *United States* v. *Carrizo*, 104 F.3d 356, 1996 WL 692512, at *2 (2d Cir. Dec. 4, 1996); *see also United States* v. *Baxter*, 884 F.2d 734, 736-37 (3d Cir. 1989) (holding that venue was proper for receipt of illegal gratuities, in violation of 18 U.S.C. § 201(g), in the district where bank on which bribe checks were drawn, even though defendant received and deposited the checks in another district).

To the extent Gross argues that the S3 Indictment fails to allege that he "intended to route the wire through [this District], or even knew that the wire passed through New York" (Gross Br. 6), no such showing is required.  *See United States* v. *Davis*, 689 F.3d 179, 186 (2d Cir. 2012) (stating that there is no requirement "that evidence must show that a defendant had actual knowledge that particular acts would occur in a particular district to support venue at that location").  Rather, it is sufficient if the acts would have been "reasonably foreseeable."  *Id.* (internal quotation marks omitted).  As the Chairman of the Board of a federal credit union, it would have been reasonably foreseeable to Gross that the bribes he solicited and received via

50

wire transfer would have passed through a bank in New York.

Second, the Government expects that the evidence at trial will show that Gross communicated with Murgio about the takeover of HOPE FCU by Murgio and his co-conspirators while Gross was in this District.  The Government has produced in discovery documents and emails showing (1) that Gross was in Manhattan and the Bronx to attend a conference on June 6 and 7, 2014; and (2) on those days, Gross exchanged emails with Murgio about the individuals who Murgio was seeking to have Gross place onto the HOPE FCU Board.[16]  As the allegations in the S3 Indictment make clear, this email exchange in early June 2014 occurred after Murgio had paid Gross approximately $30,000 in bribes in May 2014 (*see* S3 Indictment ¶¶ 19(c), 19(d)), but before Murgio caused an additional $120,000 bribe to be paid to Gross later in June 2014 (*see id.* ¶ 19(e)).  This email communication was, therefore, an essential part of the *quid pro quo* arrangement between Gross and Murgio, and further supports venue for Count Five in this District.  *See Carrizo*, 1996 WL 692512, at *2 (holding that even "though the actual words of solicitation were uttered and the physical act of accepting money was completed[outside]" this District, venue was nevertheless appropriate for Section 215(a)(2) violation because defendant processed loans in this District for which he had solicited bribes); *cf. United States* v. *Stephenson*, 895 F.2d 867, 874 (2d Cir. 1990) (holding in Section 201 bribery case that venue was proper in this District where defendant, who was in Washington, D.C., "enter[ed], by

---

[16]    For example, on June 7, 2014, Murgio emailed Gross stating: "I believe all of these members have submitted all proper info."  The email then lists several individuals who Gross arranged to have nominated and elected to the HOPE FCU Board, including Lebedev.  Later the same day while he was in New York, Gross responded to the email, stating: "I think we are just missing Rico," who was one of Murgio's employees at Coin.mx and who Gross had placed on the HOPE FCU Board.  In his email, Gross noted that he was "[i]n a major conference this weekend so [his] responses will be slower."  The Government expects the evidence at trial will show that the "conference" to which Gross alluded in his email took place in Manhattan and the Bronx.

telephone, the Southern District, where his bribery targets conducted business").

Because the S3 Indictment as supplemented by discovery and other disclosures to counsel sufficiently inform Gross of the nature of the charge against him and the facts supporting venue in this District, a bill of particulars is unwarranted.

### 2.      Lebedev's Motion for a Bill of Particulars Should be Denied.

Despite the hyperbole of Lebedev's brief (*see, e.g.* Lebedev Br. 1 (analogizing the Government's charging decisions to "the style of a certain popular politician")), the S3 Indictment makes perfectly clear that Lebedev is named as a defendant only in Counts Three and Four, which charge him with conspiracy to commit bank bribery and committing bank bribery, respectively.  As such, Lebedev's concerns that he must "guess as to the nature of the charges against him" and that the Government "intends to prove that Lebedev was a co-conspirator in the fraud, unlicensed money transmitting, and money laundering offenses" (Lebedev Br. 5) are unfounded.  While the Government expects to introduce evidence at trial showing Lebedev's involvement in the operations of Coin.mx (as is described in the S3 Indictment), such evidence is admissible to provide background to the bank bribery scheme charged in Counts Three and Four, to explain the criminal relationship between Lebedev and Murgio, and to help prove the other counts against Murgio.[17]  To the extent Lebedev seeks identification of co-conspirators

---

[17]      Lebedev's concern that he "will not adequately be able to challenge the admission of co-conspirator statements" under Federal Rule of Evidence 801(d)(2)(E) is unwarranted.  (Lebedev Br. 6).  Pursuant to that rule, a district court may admit an out-of-court declaration that would otherwise be hearsay if it finds "by a preponderance of the evidence (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy."  *United States* v. *Coppola*, 671 F.3d 220, 246 (2d Cir. 2012) (internal quotation marks omitted).  Such evidentiary rulings are made based upon the factual record at trial, including the challenged statements themselves.  Moreover, the objective of the conspiracy to which the statement relates "need not be any particular crime charged in the indictment."  *Id.* (internal quotation marks).  Accordingly, it is unnecessary at this stage to disclose the identities

referenced in paragraphs relating to counts in which Lebedev is not charged (*see* S3 Indictment ¶¶ 6-9, 11-12, 25-26, 30-31), such information plainly is not necessary to prepare a defense against the charges pending against Lebedev.

Moreover, Lebedev's request that the Government identify the co-conspirators referenced in various paragraphs of the S3 Indictment relating to Counts Three and Four (*see* S3 Indictment ¶¶ 10, 17-18), is exactly the type of request that courts "routinely deny." *Trippe*, 171 F. Supp. 2d at 240.  In this case, the number of individuals involved in the bank bribery scheme is not large and their identities are fully disclosed in the discovery that has been produced to Lebedev.  And as a core participant in the bribery scheme (and the operation of Coin.mx, for that matter), Lebedev is intimately familiar with the identity of his co-conspirators.  As such, this is not a case where there will be any surprise at trial as to the identities of the co-conspirators involved in the scheme to bribe Gross.  *See, e.g.*, *United States* v. *Cook*,  No. 13 Cr. 777 (AJN), 2014 U.S. Dist. LEXIS 182268, at *15 (S.D.N.Y. Mar. 10, 2014) (denying motion for bill of particulars identifying other co-conspirators where "the co-conspirators are alleged to have worked directly with one another").

Lebedev's request that the Government specify the "dates, locations, and amounts of bribes" that Lebedev paid, as charged in Count Four (*see* Lebedev Br. 6-7) should be denied as moot.  Count Four charges, in pertinent part, that Lebedev, along with Murgio and Michael Murgio, violated Sections 215(a)(1) and 2 of Title 18 of the United States Code, because they

> did corruptly give [and] offer . . . a sum of money greater than $1,000, with the intent to influence and reward an officer, director, employee [and] agent . . . of a financial institution, to wit, [Gross], the Chairman of the Board of HOPE FCU, in

---

of the other co-conspirators referenced in the S3 Indictment in order to preserve Lebedev's ability to object to the admission of co-conspirator statements at trial.

> connection with a business and transaction of such institution, to wit, the operations of HOPE FCU."

(S3 Indictment ¶ 21).  Under Section 2, Lebedev is "punishable as a principal" if he "aids, abets, counsels, commands, induces or procures" a violation, or attempted violation, of Section 215(a)(1), or if he "willfully causes" the same.  18 U.S.C. § 2.  Thus, to the extent Lebedev demands that the Government specify the "bribes that *he* allegedly made" (Lebedev Br. 6 (emphasis in original)), such a demand is baseless.  Lebedev may be convicted of aiding and abetting, or willfully causing, Murgio's payment of bribes to Gross in order to acquire control of HOPE FCU in furtherance of Coin.mx's operations.  Further, the S3 Indictment already sets forth the approximate dates and amounts of the bribes that were paid, or attempted to be paid, to Gross. (*See* S3 Indictment ¶¶ 19(c)-(e), 19(g)-(j)).  And, as described above, the S3 Indictment also alleges that at least one of the bribes "was transferred via wire through the Southern District of New York" (*id.* ¶ 19(c)), and the bank records and wire transfer records produced to the defendants show that other bribes were sent through banks in Manhattan as well, thus plainly establishing venue for Count Four.  As such, Lebedev has sufficient notice of the nature of the charges pending against him to prepare a defense and no bill of particulars is necessary.

## POINT IV:  LEBEDEV'S MOTION TO STRIKE SURPLUSSAGE SHOULD BE DENIED

Lebedev seeks to strike what he contends is "surplussage" from the S3 Indictment.  In particular, Lebedev seeks to strike "over blown characterizations of Lebedev's role in the other Coin.mx schemes" in Paragraphs 3 and 5 of the S3 Indictment.  (Lebedev Br. 8, 10).  These portions of the Indictment are not objectionable and, in any event, Lebedev's motion to strike them is premature.

### A.   Applicable Law

"Although the Federal Rules of Criminal Procedure grant the Court authority to strike surplussage from an indictment, *see* Fed. R. Crim. P. 7(d), it has long been the policy of courts within the Southern District to refrain from tampering with indictments." *United States v. Bin Laden*, 91 F. Supp. 2d 600, 621 (S.D.N.Y. 2000) (internal quotation marks and alterations omitted).  "Motions to strike surplussage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) (internal quotation marks omitted).  "'[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken.'" *Id.* (quoting *United States v. DePalma*, 461 F. Supp. 778, 797 (S.D.N.Y. 1978) (alteration in the original)); *see also United States v. Rittweger*, 259 F. Supp. 2d 275, 293 (S.D.N.Y. 2003) (collecting cases).  "Courts have held that statements providing background [on the crimes charged] are relevant and need not be struck." *United States v. Ulbricht*, No. 14 Cr. 68 (KBF), 2014 WL 5090039, at *17 (S.D.N.Y. Oct. 10, 2014).

### B.   Discussion

The references to Lebedev in Paragraphs 3 and 5 are both relevant to the crimes with which Lebedev is charged and non-inflammatory.  The fact that Murgio operated Coin.mx "with the assistance of other individuals, including [Lebedev]" (S3 Indictment ¶ 3) is relevant background information as to the relationship between Murgio and Lebedev and Lebedev's role in helping operate Coin.mx.  It also helps explain why and how Lebedev came to be involved in the bank bribery scheme.  Similarly, the references to "their conspirators" (referring to co-conspirators of Murgio and Lebedev) in both Paragraphs 3 and 5 are factually accurate and relevant.  They refer to the fact that other co-conspirators of Murgio and Lebedev involved in the

bank bribery scheme were also involved in operating Coin.mx, as part of which they "enabled customers to exchange cash for Bitcoins" (*id.*), "engaged in substantial efforts to evade detection of their unlawful Bitcoin exchange scheme," and "sought to trick the financial institutions through which Coin.mx operated" (*id.* ¶ 5).  Although Lebedev is not charged with operating an unlicensed money transmitting business or wire fraud based upon the misrepresentations made to banks, these allegations are critical to explaining the story of how and why Lebedev became involved in the scheme to bribe Gross to take over HOPE FCU in furtherance of Coin.mx's operations.  They are also relevant to Lebedev's intent to commit bribery.  Furthermore, these allegations are no more inflammatory than the allegations concerning Lebedev's participation in the bribery scheme.

In any event, Lebedev's motion to strike is premature.  "Courts in this district routinely await presentation of the Government's evidence at trial before ruling on a motion to strike." *United States* v. *Mostafa*, 965 F. Supp. 2d 451, 467 (S.D.N.Y. 2013) (citing cases).  While Lebedev may challenge the admission of evidence concerning his involvement in Coin.mx, unless and until he prevails on that issue at trial or in pretrial motions, any motion to strike references to Lebedev's conduct relating to Coin.mx is premature.  *See, e.g.*, *Ulbricht*, 2014 WL 5090039, at *17 (denying motion to strike references to murders-for-hire included as overt acts in narcotics conspiracy charge, given potential relevance to defendant's criminal intent, which was best evaluated based on "the Government's presentation at trial").  Accordingly, Lebedev's motion to strike should be denied at this time.[18]

---

[18]     In the alternative, to the extent the Court determines that any of the defendants' motions regarding the S3 Indictment have any merit, the Government respectfully requests leave to seek a superseding indictment.

## POINT V:  LEBEDEV'S RENEWED MOTION FOR SEVERANCE IS WITHOUT MERIT

Lebedev renews his motion to sever, pursuant to Rule 14 of the Federal Rules of Criminal Procedure, which this Court denied on the record at the pretrial conference on March 4, 2016. (*See* Tr. 11-17 (Mar. 4, 2016) (Dkt. No. 72).  Lebedev's motion for reconsideration of the Court's ruling is both untimely, *see* Local Civ. R. 6.3 ("[A] notice of motion for reconsideration or reargument of a court order determining a motion shall be served within fourteen (14) days after the entry of the Court's determination of the original motion and without merit."), and still without merit.  As set forth in the Government's brief in opposition (Dkt. No. 48) to Lebedev's original severance motion, and as this Court acknowledged in its March 4, 2016 ruling, the facts underlying Lebedev's involvement in the Coin.mx scheme are inextricably intertwined with Lebedev's role in the bribery scheme.  Accordingly, a joint trial of Murgio and Lebedev is both appropriate and most efficient and, therefore, serves the interest of justice.  Because Lebedev points to no facts or law that this Court overlooked in denying his original motion to sever, his application should be denied.

## POINT VI:  THE DEFENDANTS' OTHER REQUESTS ARE MOOT OR PREMATURE

### A.    Request for Disclosure of Co-Defendants' Admissions or Confessions

Murgio seeks an order directing the Government to "provide pre-trial notice of all co-defendant post-arrest statements, admissions, or confessions which it intends to introduce at trial."  (Murgio Omni Br. 3).  This request should be denied as both moot and premature.

It is well-established that statements made by co-conspirators are not discoverable under Federal Rule of Criminal Procedure 16(a).  *See In re United States*, 834 F.2d 283, 286-87 (2d Cir. 1987); *United States* v. *Percevault*, 490 F.2d 126, 130-31 (2d Cir. 1974).   And as courts in this District routinely hold, "*Bruton* [v. *United States*,  391 U.S. 123 (1968)] and its progeny . . .

do not mandate pretrial disclosure of statements to the defense, *United States* v. *Munoz*, 736 F.

Supp. 502, 504 (S.D.N.Y. 1999), "[n]or does any other specific discovery rule require the

government to produce statements that might raise issues under *Bruton*," *United States* v. *Stein*,

424 F. Supp. 2d 720, 727 (S.D.N.Y. 2006); *see also United States* v. *Wei*, 862 F. Supp. 1129,

1134 (S.D.N.Y. 1994) (denying a motion "directing the government to disclose all statements of

co-conspirators," because they "are not discoverable under Federal Rule of Criminal  Procedure

16(a)," and noting that "*Bruton* and its progeny . . . do not mandate pretrial disclosure of

statements to the defense").

Because neither Rule 16 or *Bruton* provides a basis for such premature disclosure of

witness statements, Murgio asserts—without any supporting authority—that he is presently

entitled to review any co-defendant's post-arrest admission or confession based on Rules 8(b)

(the rule on joinder of defendants); "12(b)5" (a subsection that does not exist in the Rules, but

presumably refers to pretrial motions); and 14 (the rule regarding relief from prejudicial joinder).

(Murgio Omni. Br. 3).  At this point, over three months before trial, the Government has yet to

determine whether it will seek to introduce any portions of the defendants' post-arrest statements

and, as such, is not in a position to determine whether any statements would implicate other co-

defendants.  Further, this determination will turn, in part, on which defendants proceed to trial.

In any event, to the extent that the Government seeks to introduce post-arrest statements

of any non-testifying co-defendants at trial, the Government will disclose such statements to

counsel sufficiently in advance of trial and appropriately redacted in conformity with *Bruton* and

its progeny.  Accordingly, the Court should deny this motion at this time on the grounds that it is

not yet ripe.  *See*, *e.g.*, *United States* v. *Gallo*, No. 98 Cr. 338 (JGK), 1999 WL 9848, *8-*9

(S.D.N.Y. Jan. 11, 1999) (denying motion to sever on basis of *Bruton* issues as premature, in

58

light of Government's representations that it will provide any post-arrest statements with notice

sufficiently before trial if it intends to offer any at trial); *United States* v. *Rodriguez*, No. 08 CR

1311 (RPP), 2009 WL 2569116, *11 (S.D.N.Y. Aug. 20, 2009) ("Defendants move for

severance under Rule 14 based on the post-arrest statement of [a co-defendant], which allegedly

inculpated [the moving defendant.] This motion to sever is premature because 'the Court does

not know [if the other two defendants] will plead before trial or how other pre-trial motions

might limit the scope of the trial.'"); *United States* v. *Henry*, 861 F. Supp. at 1196 (denying

request for order directing government to disclose any statements of non-testifying co-defendants

which it intends to introduce at trial so that any *Bruton* issues may be resolved in advance of trial

as "premature," in part because "the Court has no information as to whether any of [the

defendant's] co-defendants will decide to plead guilty.").

**B.      Request for Immediate *Brady* and *Giglio* Disclosures**

        Murgio and Lebedev's requests for immediate disclosure of materials pursuant to *Brady*

v. *Maryland*, 373 U.S. 83 (1963), *Giglio* v. *United States*, 405 U.S. 150 (1972), and their

progeny, should be denied.  (*See* Murgio Omni. Br. 4; Lebedev Br. 11).  Courts in this District

consistently refuse to compel disclosure of such material so far in advance of trial because "as a

general rule, *Brady* and its progeny do not require immediate disclosure of all exculpatory and

impeachment material upon request by a defendant."  *United States* v. *Coppa*, 267 F.3d 132,

145-46 (2d Cir. 2001).  This is because "as long as a defendant possesses *Brady* evidence in time

for its effective use, the government has not deprived the defendant of due process . . . simply

because it did not produce the evidence sooner."  *Id.* at 144.  Thus, the Government may

normally produce *Giglio* material when it produces Section 3500 material, as long as such

disclosures are made in time for their effective use at trial.  *See id.*; *see also United States* v.

*Nixon*, 418 U.S. 683, 701 (1974) ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial.").[19]

Courts in this District adhere to these principles as a routine matter in criminal cases, with the understanding that, in conformity with the common and well-established practice in this District, Section 3500 material, including *Giglio* for Government witnesses, will be disclosed by the Government at least by the Friday before trial. *See, e.g., United States* v. *Davis*, No. 09 Cr. 143 (LBS), 2009 WL 1211403, at *14 (S.D.N.Y. May 5, 2009) ("[I]mpeachment material ordinarily need not be disclosed until the witness is called to testify at trial"); *United States* v. *Noble*, No. 07 Cr. 284 (RJS), 2008 WL 1990707, at *9 (S.D.N.Y. May 7, 2008) (denying request for early disclosure of *Giglio* and 3500 material where the Government agreed to turn over such materials the Friday before trial); *United States* v. *Trippe*, 171 F. Supp. 2d 230, 237 (S.D.N.Y. 2001) ("The usual practice in this district is that the Government agrees to make impeachment information available to the defense at the same time as Jencks Act material, that is, at least one day before the Government witness is called to testify").

The Government recognizes its obligations under *Brady* and has acknowledged its understanding of its *Brady* obligations in correspondence to defense counsel.  Should the Government become aware of *Brady* material, it will produce it in a timely manner.  Further, there is no basis for early disclosure of *Giglio* material in this case.  In accordance with common practice in this District, the Government will provide the defense with all impeachment material

---

[19]    As the Second Circuit has noted, Section 3500 "prohibits a District Court from ordering the pretrial disclosure of witness statements." *Coppa*, 267 F.3d at 145-46 (granting mandamus and remanding after district court ordered immediate disclosure of "all exculpatory and impeachment evidence"); *see also In re United States*, 834 F.2d at 287 (granting mandamus and remanding because District Court has no authority to order pretrial production of Jencks Act material).

that must be produced under *Giglio* at the same time that it provides Section 3500 material, which will be sufficiently in advance of trial so as to permit defense counsel adequate time to prepare for cross examination of Government witnesses.  *See, e.g., Thompson*, 2013 WL 6246468, at *9 (denying motion to compel *Brady* and *Giglio* disclosures "[i]n light of the Government's 'good-faith representation to the court and defense counsel that it recognizes and has complied with its disclosure obligations under *Brady*'" (quoting *United States* v. *Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996)); *accord United States* v. *Gallo*, No. 98 Cr. 338 (JGK), 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999).

**C.    Request for Rule 404(b) Notice**

Murgio and Lebedev also request notice of any evidence the Government seeks to introduce under Federal Rule of Evidence 404(b), or evidence of "other acts" or "uncharged conduct," in advance of trial.  (Murgio Omni. Br. 9-11; Lebedev Br. 11-12).  This request should be denied as moot in light of the Court's June 28, 2016 Order, which sets the deadline for any 404(b) motions and motions *in limine* for September 12, 2016, over six weeks in advance of trial.

**D.    Request for the Disclosure of Identities of Confidential Informants or Cooperating Co-Defendants**

Murgio also requests that the Government be ordered to "immediately disclose the names and criminal histories of the confidential informants or cooperating co-defendants."  (Murgio Omni. Br. 11).  This request should be denied.

As a general matter, it is well-established that the Government is not required to disclose the identities of its witnesses substantially in advance of trial.  *See* Fed. R. Crim. P. 16; *Weatherford v. Bursey,* 429 U.S. 545, 559 (1977); *see also United States* v. *Alessi*, 638 F.2d 466, 481 (2d Cir. 1980) ("[T]he prosecution [is] under no obligation to give [a defendant] advance warning of the witnesses who [will] testify against him."); *Thompson*, 2013 WL 6246489, at

*10-11.  Accordingly, "in the absence of a *specific* showing that disclosure [of a witness list] was both material to the preparation of [the] defense and reasonable in light of the circumstances surrounding [the] case," the request for a witness list should be denied.  *United States* v. *Bejasa*, 904 F.2d 137, 139-40 (2d Cir. 1990) (emphasis and alterations in original; internal quotations marks omitted).

In addition, the Government enjoys a qualified privilege against disclosure of informant and cooperating witness identities in advance of trial.  *See, e.g.*, *United States* v. *Jackson*, 345 F.3d 59, 69 (2d Cir. 2003) (Government "enjoys a privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law" (internal quotations marks omitted); *United States* v. *Fields*, 113 F.3d 313, 324 (2d Cir. 1997) ("The government is not generally required to disclose the identity of confidential informants.").  In order to overcome the presumption against pretrial disclosure of an informant's identity, the "defendant bears the burden of showing the need for disclosure of an informant's identity," *Fields*, 113 F.3d at 324, which can only be met when "the informant's testimony is shown to be *material* to the defense," *United States v. Saa,* 859 F.2d 1067, 1073 (2d Cir.1989) (emphasis added), such that its non-disclosure would deprive the defendant of his right to a fair trial, *see Fields*, 113 F.3d at 324; *accord Cook*, 2014 U.S. Dist. LEXIS 182268, at *11; *Thompson*, 2013 WL 6246489, at *10.  The Second Circuit has described this burden as a "heavy" one, because a defendant must establish that disclosure of the identity is "essential to the defense," *United States* v. *Jimenez*, 789 F.2d 167, 170 (2d Cir. 1986).

Here, Murgio's only proffered argument as to the materiality of the identity of any confidential informants or cooperators to the defense is that "it *strongly appears* that the informants or co-defendants were participants in critical events, and *may* be key witnesses

against the defendant." (Murgio Omni. Br. 12 (emphasis added)). But that is precisely the type of "[m]ere speculation . . . that the informer may possibly be of some assistance" that courts have routinely concluded "does not overcome the strong public interest in protecting informants." *United States v. Castro,* No. 93 Cr. 809, 1995 WL 6235, at *2 (S.D.N.Y. Jan. 6, 1995) (citing *United States v. Martinez,* 634 F. Supp. 1144, 1147 (S.D.N.Y. 1986)); *accord Fields,* 113 F.3d at 324 ("Speculation that disclosure of the informant's identity will be of assistance is not sufficient . . . [T]he district court must be satisfied, after balancing the competing interests of the government and the defense, that the defendant's need for disclosure outweighs the government's interest in shielding the informant's identity."). The mere fact that an informant was a participant in and witness to the crime charged is insufficient to establish the materiality of the informant's testimony. *See Saa*, 859 F.2d at 1073-74 (concluding that disclosure was required as to informant's identity where one defendant argued that the informant could shed light on "an apparent contradiction in the testimony" as to whether the informant was present at the scene of a crime, but not required as to two other defendants who had not otherwise explained materiality, notwithstanding the witness' status as "both a witness to and a participant in many of the events that led to [their] conviction").

Because Murgio fails to "explain why the interviews he seeks would assist him in his defense," *Castro,* 1995 WL 6235, at *2, or even "some plausible explanation of the assistance" he might receive from the information sought, *Cook,* 2014 U.S. Dist. LEXIS 182268, at *11 (quoting *United States* v. *Valenzuela-Bernal,* 458 U.S. 858, 871 (1982)), his proffered reasons are insufficient to show that the requested identities and interviews are warranted. *See Thompson*, 2013 WL 6246489, at *10-11 (denying motion for identities of confidential informants and cooperating witnesses because "assertions regarding the [cooperating] witnesses'

participation in the crime charged, [and that the witnesses possessed information relevant to the

issue of guilt]. . . do not 'explain why the interviews [the defendant] seeks would assist him in

his defense,' and they are insufficient to show that the requested identities and interviews are

'material' to [the] defense." (citations omitted)); *United States* v. *Ojeikere*, 299 F. Supp. 2d 254,

262 (S.D.N.Y. 2004) (denying request for production of confidential informant's identity where

the defendant "simply speculate[d] about what further information the informant might be able to

provide").

In any event, should the Government decide to call a confidential informant or

cooperating co-defendant at trial, the Government understands its obligations to produce

impeachment material for those witnesses.  As discussed above, the Government intends to turn

over Section 3500 and *Giglio* material for its witnesses sufficiently in advance of trial so as to

permit defense counsel adequate time to prepare for cross examination of Government witnesses.

Based upon that representation, Murgio's request for immediate disclosure of names of these

witnesses as well as their criminal histories should be denied.

## **CONCLUSION**

For the foregoing reasons, the defendants' pretrial motions should be denied in their

entirety.

Dated:  July 15, 2016                               Respectfully submitted,
         New York, New York


                                    PREET BHARARA
                                    United States Attorney for the
                                    Southern District of New York


                             By: _____/s/_____
                                    EUN YOUNG CHOI
                                    DANIEL S. NOBLE
                                    Assistant United States Attorneys