UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA              :          S3 15 Cr. 769 (AJN)

   - against -                               :

ANTHONY MURGIO,                        :

               Defendant.          :

-------------------------------------------------------x

**SENTENCING MEMORANDUM
ON BEHALF OF ANTHONY MURGIO**

BRIAN E. KLEIN
BAKER MARQUART LLP
2029 Century Park East, Suite 1600
Los Angeles, California 90067
(424) 652-7800

ROBERT A. SOLOWAY
ROTHMAN, SCHNEIDER,
SOLOWAY & STERN, LLP
100 Lafayette Street
New York, New York 10013
(212) 571-5500

*Attorneys for Anthony Murgio*

**TABLE OF CONTENTS**

**Page(s)**

**INTRODUCTION**………………………………………………………………...1

**DISCUSSION**…………………………………………………………………...3

    1.     The Presentence Report and The Guidelines Calculation……………………..3

    2.     Anthony Murgio's Personal History and Characteristics……………………...4

          a.     Anthony's Upbringing, Schooling, and Work History………………4

          b.     Supportive Testimonials: The Anthony Known to Family, Friends, and Others……………………………………...…7

    3.     The Uncontested Sentencing Guidelines Range Does Not Properly Reflect Anthony Murgio's Culpability When Considering the 18 U.S.C. § 3553(a) Factors………………………….12

    4.     Anthony Murgio's Assistance of Ransomware Victims Should Not Be Factored Into His Sentence………………………………………15

    5.     *De Minimis* Forfeiture Is Appropriate In This Case…………………………17

**CONCLUSION**………………………………………………………………...20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

United States v. Adelson,
    441 F.Supp.2d 506 (S.D.N.Y. 2006) .................................................................13

United States v. Bajakajian,
    524 U.S. 321 (1998) ...........................................................................................18

United States v. Gupta,
    904 F.Supp.2d 349 (S.D.N.Y. 2012) .................................................................13

United States v. Rawlins,
    CR 15-377 ...........................................................................................................14

United States v. Viloski,
    814 F.3d 104 (2d. Cir. 2016) .......................................................................18, 19

**Federal Statutes**

18 U.S.C. § 981(a)(1)(C) ...........................................................................................18

18 U.S.C. § 1030(a)(7) ...............................................................................................16

18 U.S.C. § 1343 ........................................................................................................13

18 U.S.C. § 1344 ........................................................................................................13

18 U.S.C. § 1960 ...................................................................................................13, 15

18 U.S.C. § 3553(a) ............................................................................................ *passim*

U.S.S.G. § 2B1.1 ................................................................................................ *passim*

## INTRODUCTION

Anthony Murgio is a fiercely competitive man with a love of business and entrepreneurship who has had a positive impact on the lives of many.  But he is before the Court for sentencing on June 27, 2017 because he operated a Bitcoin exchange dishonestly. He side-stepped licensing and other regulatory mandates important to our nation's anti-money laundering strategies, misled banks so he could operate the Bitcoin exchange, and obstructed the investigation of a federal regulator looking into his ventures.  Through his illegal actions, he gained an unfair advantage over competitors who played by the rules.

Anthony has pleaded guilty to his crimes and accepts responsibility for them.  His misdeeds have had catastrophic consequences for many people he dearly loves, including his own father, and damaged others he once called close friends and colleagues.  He acted improperly in ways barely imaginable to him now, and he will carry that heavy burden with him for the rest of his life, in addition to all the penalties the Court imposes on him.

Importantly, Anthony is also in many ways a very good man.  He has guided, helped, and inspired numerous people from all walks of his life and all types of backgrounds.  The stories the Court will read below and in the attached letters are poignant and revealing. Equally important, while roundly chastened, he stands committed to moving forward in his life energetically and with resolve to never again take actions like the ones that have put him before this Court for sentencing.

As the Court knows, Anthony's two co-defendants, Yuri Lebedev and Trevon Gross, did not plead guilty, and after a multi-week trial, they were convicted on all counts.  During that trial, the Court learned much of what happened, and heard much about Anthony.  And since he did not go to trial and have counsel in the courtroom to cross-examine or put in his

1

own evidence, the Court did not get a full picture of Anthony the person.  For example, the prosecution questioned a number of witnesses about Anthony's prior arrests in Florida and tax situation.  But the Court should know that he was never prosecuted by Florida authorities, and his civil tax problems stemmed from a business dispute that has been resolved.[1]  The letters from family, friends, and others who have known Anthony also supply a more complete – and significantly more positive – picture of Anthony.

Anthony stands before this Court to be sentenced as a non-violent, first-time offender who has a tremendous amount of promise that a long prison term would unnecessarily diminish.  Below are the reasons based on the factors found in 18 U.S.C. § 3553(a) that a prison sentence significantly below both the uncontested advisory Guidelines range of 121 to 151 months and below the Presentence Report's recommendation of 96 months is warranted in Anthony's case.  In short, they revolve around the totality of who Anthony is (e.g. someone willing and ready to help others in need); who he can still be (e.g., a successful entrepreneur); and, finally, around the unique circumstances of the offenses in this case (e.g., he ran an unlicensed bitcoin exchange, but in doing so, he did not steal money or property from customers or banks).  With regard to the latter, as discussed below in detail, the uncontested 18 U.S.S.G. § 2B1.1 loss amount of approximately $12.7 million (resulting in a 20 level enhancement) tied to two of the charges Anthony pleaded guilty to, Counts 1 and 6 of the sixth superseding indictment, does not comply with the purposes set forth in § 3553(a),

---

[1] The Court will receive a letter from Brett Fisher, a partner in a Florida law firm of Blackwell, Vishio, and Fisher, PLLC.  Mr. Fisher represented Anthony with respect to the Leon County tax arrest which is detailed in the PSR  (PSR ¶¶ 68-69), and also was elicited by the government at trial ("Q: What if anything happened to Anthony Murgio in connection with his failure to pay sales tax at the restaurant ... A: I know he was arrested.") (J. Freundt Trial Testimony at pp.  1965-66.)  That letter is expected to explain that Anthony was involved in no criminal activity whatsoever despite his arrest; that it was established in the matter he totally lacked any criminal intent, yielding the *nolle prosequi* outcome; and that he entered into a civil settlement to conclude the matter.  We expect to have Mr. Fisher's letter for filing by no later than June 16, 2017.

including reflecting the seriousness of the offenses and providing just punishment for the offenses.

The Court should sentence Anthony to a term dramatically less than 96 months and consistent with a finding pursuant to the § 3553(a) factors that the § 2B1.1 loss amount of approximately $12.7 million should be deeply discounted because it fails to provide either a meaningful gauge of Anthony's blameworthiness, or a measure of what a reasonable sentence would look like. Such a sentence will appropriately punish Anthony for the offenses, but it will also give him a chance to work towards redeeming his name, making things right with those he has hurt, and building the bright future that remains within his grasp.

## DISCUSSION

### 1. **The Presentence Report and The Guidelines Calculation**

The PSR was issued on June 6, 2017. The PSR agrees with the parties' Guidelines calculation of a total offense level of 32 and, resulting in a sentencing range of 121 to 151 months' imprisonment. The PSR recommends a prison sentence of 60 months on Counts 1 and 3 to run concurrently with a prison sentence of 96 months for Count 6. The PSR recommends a below Guidelines sentence, in part, because the "mechanical nature of the [G]uidelines, and the subsequent [G]uidelines range, does not capture the essence of the offense." (PSR at p. 27.)  This is correct for reasons that are discussed in detail below.

The defense objects to one small item in the PSR. Paragraph 13 references Counts 6, 7, and 8, when we believe it should reference Counts 1, 3, and 6.

The defense also objects to the PSR's inclusion of assisting ransomware victims as part of the offense conduct in Paragraph 32. The PSR does note that the Court should decide

3

if such conduct is criminal.  (PSR at p. 25.)  For the reasons discussed below, we believe the Court should decide it does not.

**2.  <u>Anthony Murgio's Personal History and Characteristics</u>**

Pursuant to 18 U.S.C. § 3553(a)(1), in arriving at a sentence that is "sufficient but not greater than necessary" to comply with the purposes of federal sentencing, the Court "should consider the nature and circumstances of the offense and *the history and characteristics of the defendant*."  (Emphasis added.)  The latter considerations are addressed by: (1) a brief overview of Anthony's life and; (2) the words and voices of the many people who have come forward to write the Court letters or make a brief video presentation regarding their knowledge of his many admirable qualities and prior good deeds.

**a.  Anthony's Upbringing, Schooling, and Work History**

Anthony has long been a dynamic and caring person.  Unfortunately, as already noted, only a shadow of that person emerged at the trial of his co-defendants.  The following aims to correct that, showing a young man with boundless energy who committed crimes despite being a compassionate and decent person.  Anthony's misdeeds have laid ruin to much; however, the many actions he has taken in life which created positive outcomes for people also merit this Court's attention and consideration in imposing sentence.

Anthony is 33 years old, the youngest son of Michael Murgio and Amelia Ostrosky, who divorced when he was 3.  (PSR ¶¶ 70-71.)  He grew up in Palm Beach Gardens, Florida, and was a happy, well-liked, and energetic child.  In high school, he played varsity football all four years and became captain of the team.  He competed in volleyball and track as well, and earned a scholar athlete award for excellence on and off the field.  He won a Palm Beach County Future Business Leaders of America award as a high school senior.

From a very young age, Anthony has had the "entrepreneurial gene." He sold snacks to his classmates in middle school to earn extra pocket money. Growing up, he often worked, and wanted to work, including holding a job at Publix supermarket in high school. (PSR ¶ 97.) He sold Cutco knives door to door during a summer while in college, and was so committed, energetic, and successful that he was one of the top salesmen because of his tireless work. (See PSR ¶ 94.)

During high school, and throughout college at Florida State University from 2002 to 2007, Anthony was intensely interested in on-line business, including marketing (advertising) and the use of cutting edge internet platforms to deliver goods and services to consumers via on-line shopping. In approximately 2010, he started a website called BidaVilla which allowed vacation property owners to offer their properties for rent (long before Airbnb), and he later sold the business for a substantial profit. (PSR ¶ 92.)

In 2007, Anthony built, owned, and began operating a restaurant in Tallahassee. After great success following years of hard work to grow the business, the venture ended in disaster in 2011, including acrimonious litigation and theft from him of $100,000 by a lawyer named Timothy McCabe he had retained to assist him.[2] Anthony lost everything and found himself living off the charity of his girlfriend without a nickel to his name. In 2012, he decided to return to his roots and try to find a way to earn a living in e-commerce. He began hearing about a new form of digital currency called Bitcoin.

Anthony was feverishly excited about the technology and business potential of Bitcoin. It was a new and wide open marketplace, and entrepreneurs and investors were

---

[2] McCabe was arrested and served a lengthy federal prison sentence for stealing millions of dollars from client escrow funds.

flocking to become pioneers and get in on the ground floor.  Anthony started small.  He bought a few bitcoin.  He opened an account at Mt. Gox, an exchange which then operated in Japan.  It was a cumbersome process to obtain the bitcoins through Mt. Gox, and Anthony, active on forums, saw demand was growing far more quickly than the supply chain could satisfy.  Since he was able to secure bitcoin through his Mt. Gox account, he then was able to also sell it a premium to customers who wanted to own it as an investment.  Because he could supply it relatively quickly, he would do so and make a small but steady return.  The demand and value of bitcoins steadily increased.  (Around that time, a bitcoin was worth at most a few hundred dollars; today a bitcoin is worth over $2,700.)

In 2012, Anthony began posting on social media and solicited partners to provide backing for a fledgling venture, which eventually led a colleague to introduce him to Israeli/Russian investors, who provided backing for Coin.mx.  The venture started hopefully for Anthony, initially with a small group of friends and business colleagues.  There was great excitement at being on board to promote and distribute a new form of currency which many believed would revolutionize and "democratize" money, and remove the vast economic power that lobbyists and other "corrupt" interests exercise selfishly over monetary policy.[3] This excitement was merited – today, there is widespread adoption and investment in Bitcoin and its underlying technology, including by established financial players and government

---

[3]  See, for example, "Why Bitcoin Really Does Represent the Democratization of Money," at https://bitcoinmagazine.com/articles/bitcoin-really-represent-democratization-money-1395137137:

> As opposed to bank-money, which can be censored at will (as the Wikileaks Banking Blockade has shown the world) it is absolutely not possible to censor payments with Bitcoin, since these payments do not require a middleman, and literally consist of cryptographically protected information ʙ a pure and therefore very equal form of free speech if you will.  For similar reasons, arbitrary confiscations of wealth ʙ as seen in Cyprus ʙ are simply out of the question as long as bitcoins are stored securely.

agencies around the world.  In the end, however, due to the criminal acts which resulted in the charges to which Anthony has pleaded guilty, and despite Anthony's tireless effort to create the most efficient and feature-laden bitcoin exchange platform ever conceived, the project flew off the rails.  It was overwhelmed by shoddy decisions and judgments, and overzealous corner-cutting that often ignored the law in pursuit of making it all work "one way or another" regardless of whether within legal boundaries or not.

Anthony has learned a great deal from his errors.  He remains in many ways a quintessential American businessman; albeit one rough around the edges.  He wants this Court to know that when given the opportunity in the future, he intends to pursue business opportunity with no less energy and drive than before, but with far greater probity and most importantly, with absolute respect for the law and regulations of this country.

### b.  Supportive Testimonials: The Anthony Known to Family, Friends, and Others

At the outset, it should be noted that most everyone who knows anything about Anthony begins talking about him by referring to his boundless energy and zest for entrepreneurial activities.  (See PSR ¶¶ 76-77, and 91 for his mother's particular observations on the topic.)  And as already noted, the Anthony who was presented at his co-defendants' trial is a dark whisper of the real Anthony.  Annexed as Exhibits A, B, and C, respectively, are letters to the Court from people who know Anthony well which are separated into three categories.

Exhibit A consists of family letters from his parents, Michael and Amelia, his step-mother, Jackie, and his Aunt Lucille.  The family's difficulties, and Anthony's personal struggle – for which he accepts full responsibility – need little introduction to this Court.  But

his family remains 100% percent supportive.

Exhibit B encompasses several letters of former fraternity brothers in Phi Sigma Kappa who were encouraged by Anthony – then President of the "house" at Florida State University – to be tolerant, serve the community, and to lead lives of sobriety and academic and entrepreneurial achievement, rather than devoted to alcohol, wild parties, and indolence. The writers each relate their personal connection to their confident, energetic chief, who, despite his popularity, is described as a person who routinely went out of his way to make others feel valued, and never condescended.  They describe how his steady leadership improved their college lives, and credit him with starting them on paths they define today as successful and enriched in large measure due to his influence and leadership.  And finally, each writer seems to believe that by recounting to the Court what are at times deeply personal histories, they are re-paying a debt of gratitude owed him in the hope that somehow their words will shine a helpful light for Anthony in what is for him the darkest period of his life.

Exhibit C is comprised of moving letters from 15 people from many quarters of Anthony's life, including neighbors of his own generation and that of his parents' who saw him grow up – and also schoolmates, co-workers, business partners and many friends, all heartbroken to watch Anthony facing his current challenges, and those that lay ahead.

Finally, a CD, labeled Exhibit D, is enclosed containing three short video clips from friends who asked to make a short oral statement on Anthony's behalf.  They are Jenna Haslam, Nick Vespa, and Phillip Saveillo.  Combined they are approximately 10 minutes in length, and we respectfully request permission of the Court to submit these statements in this form.

Collectively, the letters and videos leave no doubt that despite the crimes he has committed, Anthony has consistently touched and inspired people around him for more than a decade, and those individuals have not forgotten or abandoned him.  They will be there for him when he emerges from prison to start his life anew, and he is committed to not letting them down.

A significant example of how Anthony helped and inspired people may be seen in the five minute video of Jenna Haslam.  For her, a life of struggle and sadness is alleviated to a degree by Anthony's many acts of simple kindness.  But an important fact to consider when viewing her video – in which Ms. Haslam describes her gratitude to Anthony for being present and sharing time with her and her young daughter following the death of her husband – is that hers is by no means a unique display of Anthony's kindness.  Ms. Haslam tells the Court that Anthony's trips with them to an amusement park allowed her daughter to feel like she has a family, when no family is present for her.  When she talks about Anthony, Ms. Haslam speaks as if she cannot quite believe he is there for her, and that it is due to reasons she cannot really understand.  Her gratitude seems boundless and she clearly relates to the Court why.  But again, the help he offers her and her daughter, the other letters and videos show, is by no means unique to her case.

The letters of Goran Cuk, Kim Koelz, Mabel Valdez, Ania Amador, and the truly extraordinary letter authored by Jack Radosovich, depict Anthony as person who does not stand idly by when action will make a positive difference in the lives of his friends.  Thus, despite his crimes, Anthony's life has not consisted only of the deeds and decisions on display at the co-defendants' trial.  Those represent only his worst moments.  Instead, the person we introduce to the Court is the entire person; the whole person who deserves to be

accurately drawn before any sentence is imposed.  That is what the letters and videos set out

to do.  They deliver praise that is due, while acknowledging Anthony's errors too.

The whole person they draw is the Anthony whom Croatian immigrant Goran Cuk

describes as "breaking the barriers of ethnicity, race, religion, and class (economic status)";

who Casey Derhak, a friend of 19 years, describes similarly but with more substance by

writing:

> One of the things I admire about Anthony is how much he
> cares about people. We went to a high school with close to
> 3,000 kids. A very diverse high school with students who
> grew up in Palm Beach or Jupiter Island with enormous
> amounts of wealth to kids from Riviera Beach coming from
> the poorest and worst conditions and everyone in between.
> Anthony is the ONLY person I knew that really went out of
> his way to help out the super poor kids from Riviera Beach.
> Anytime there was an event or a party Anthony would
> make sure there was a way for these kids to get there and be
> a part of it. Even if that meant having to go drive into the
> projects in Riviera Beach and pick up (and drop off) kids
> that were less fortunate.[4]

Some of the letters are simply personal observations of neighbors who have known Anthony

all his life.  An example is that of Cheryl and Antonius Kalokerinos, (Exhibit C) who

describe the Murgio's youngest child as an "adorable little boy whom everyone called ANT":

---

[4] The flip side of Derhak's letter is that of Travis Hines, annexed as part of collective Exhibit C, now of Omaha,
Nebraska, but formerly of Rivera Beach, who writes:

> I am a small business owner of HinesGLOW Entertainment LLC. I also
> mentor kids in entrepreneurship. I am writing you on behalf of Anthony
> Murgio. I have been friends with Anthony since high school. We play
> [stet] football and ran track together. Anthony and his family played a
> positive role in a lot of people's lives. Like for instance, I grew up in
> Riviera Beach and hanging with the wrong crowd could have left me
> dead or in jail. The Murgio family opened their arms to the whole
> football team, which most of us were from Riviera Beach. Anthony's
> family had cookouts and invited us not judging us from where we lived
> or came from. If it wasn't for Anthony invited us players we wouldn't
> have experienced the luxury that his family had. At the time I've never
> been to a house with a golf course in the back yard. That moment
> opened my eyes to want better out of life.

> He was always such a good boy. He played well with
> others, had a great disposition, always happy and was kind
> to others. He was well liked by adults and his peers. These
> qualities and characteristics have not changed! As the years
> progressed we watched Anthony grow into a terrific young
> man! He did well in school, had many good friends, he was
> never involved with the wrong crowd, never did drugs or
> drink. Anthony went on to Florida State University where
> he flourished. We were always so proud of Anthony
> and said repeatedly, "that he will make something of
> himself someday!"

But it is not only that Anthony was a neighbor who played well with others and stayed out of

trouble that is relevant.  It is much more.  Anthony has consistently gone out of his way to do

special things that are important to others, and that is what the letters and videos

unequivocally depict.  Thus, Ms. Kalokerinos' letter concludes:

> I will never forget the time Tony and I took a trip to the
> panhandle of Florida with my elderly parents. We decided
> to stop in Tallahassee, Florida to see Anthony's new
> restaurant. We arrived around lunch time. They were
> not open for lunch, only dinner. What does Anthony do?
> He rolled out the red carpet; opened the whole restaurant
> for us and served us a fantastic lunch. My parents were so
> impress [stet] with Anthony, but that is just the
> way he is, loving, caring, giving, and wanting to please
> others.

The passion underlying descriptions of Anthony in the collected letters and videos is

real, and is based on acts and conduct of a real person.  That person, as is clear, is far from

perfect.  He caused substantial damage, and the wreckage is strewn widely.  But he has

always been committed to inclusiveness, tolerance, and taking action to help others down on

their luck, sad, or struggling – for which the letters and videos provide ample proof (e.g., Ms.

Haslam, when her husband passed away and she was left alone to raise her daughter; Mr.

Radosovich, when in college, he "came out" as gay to Anthony, and received nothing but

11

Anthony's love and support; the restaurant employee whose teeth were rotting and for whom Anthony paid out of his pocket for dental costs, as described in the letter of Michael Murgio; Ms. Koelz, who describes Anthony's "strong stance" in high school against drugs and drinking, but recalls that he spent much less time admonishing peers than he did going out of his way to personally drive them home from parties so they would arrive safe and sound; and the list goes on.).

Overall, the letters show who Anthony is, but also who he can be when he is done with his sentence, namely someone who can contribute much to society and others. Anthony deeply regrets not proceeding differently with Coin.mx and the ventures that have him before this Court, and he will never forget the awful consequences to him and those he loves, including most especially, his father.

### 3. The Uncontested Sentencing Guidelines Range Does Not Properly Reflect Anthony Murgio's Culpability When Considering the 18 U.S.C. § 3553(a) Factors

The advisory Guideline sentence range of 121 to 151 months exacts too high a price in Anthony's case by a significant margin in light of the 18 U.S.C. § 3553(a) factors. This is due to the high Guidelines loss range of $9.5 to $25 million calculated under U.S.S.G. § 2B1.1. Out of the total of 35 Guidelines points calculated by the parties and the PSR, no fewer than 20, or almost two-thirds of the total, are the product of that loss range, per § 2B1.1(b)(K).

The defense agrees those are the proper Guidelines and loss ranges, per the terms of the plea agreement. But that loss range and therefore the resulting sentencing range do not comply with the purposes set forth in § 3553(a), including reflecting the seriousness of the

offenses and providing just punishment for the offenses.  A significantly lower sentenced is called for under § 3553(a).

The loss range of $9.5 to $25 million is based on an estimated loss amount of approximately $12.7 million for Counts 1 (conspiracy to operate an unlicensed money transmitter in violation of 18 U.S.C. § 1960) and 6 (conspiracy to commit wire and bank fraud in violation of 18 U.S.C. §§ 1343 and 1344).  This amount reflects the deposit and withdrawal value of Coin.mx transactions that went through its accounts at various banks, with about $6.4 million flowing in and $6.3 million flowing out.  It does not reflect any loss of money by Coin.mx customers, banking partners, or anyone else – rendering the word "loss" a true misnomer as it relates to what actually transpired under § 3553(a).  Although under § 3553(a) the approximately $12.7 million that went in and out of Coin.mx's bank accounts has some bearing on the scope of offense, it "does not capture the essence of the offense," as the PSR itself notes.  (PSR at p. 27.)

Stepping back, it must be noted that the Guidelines are often criticized, and rightfully so, for their mechanical approach to justice.  As the Honorable Jed Rakoff pointed out:

> Imposing a sentence on a fellow human being is a
> formidable responsibility. It requires a court to consider,
> with great care and sensitivity, a large complex of facts and
> factors. The notion that this complicated analysis, and
> moral responsibility, can be reduced to the mechanical
> adding up of a small set of numbers artificially assigned to
> a few arbitrary-selected variables wars with common sense.
> Whereas apples and oranges may have but a few salient
> qualities, human beings in their interactions with society
> are too complicated to be treated like commodities, and the
> attempt to do so can only lead to bizarre results.

United States v. Gupta, 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012); see also United States v. Adelson, 441 F.Supp.2d 506, 509 (S.D.N.Y. 2006) ("As many have noted, the Sentencing

Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as . . . the amount of financial loss in fraud cases, without, however, explaining why it appropriate to accord such huge weight to such factors.")

The defense is well aware that this Court is sensitive to this issue too.  As an example, the Court adjudicated the case of <u>United States v. Rawlins</u>, CR 15-377, in which the first-time, non-violent defendant went to trial, testified, and was convicted of wire fraud by the jury.  There, despite the Court finding Rawlins gave false trial testimony that constituted obstruction justice and finding a § 2B1.1 loss range of $9.5 to $25 million because Rawlins stole in excess of $10 million (which contributed heavily to his Guidelines range of 135 to 168 month), the Court varied downward from the Guidelines and sentenced Rawlins to 108 months.

As set forth above, here, the § 2B1.1 figure of approximately $12.7 million is not rationally related to blameworthiness on Anthony's part in accordance with § 3553(a) because, unlike in <u>Rawlins</u> -- where the Court found a direct relationship between loss and blame in light of the number of victims, direct financial impact on them, and the reasons why Rawlins committed the offense, namely, out of greed so he could live lavishly – Anthony stole from nobody and did not enrich himself with millions in ill-gotten gain.

Quite simply, the approximately $12.7 million significantly overstates Anthony's core conduct when considering the § 3553(a) factors, namely, failing to register and license his bitcoin exchange and securing bank accounts by not disclosing they were for a bitcoin exchange.  Anthony's intent was never to steal from Coin.mx's customers, the banks where

Coin.mx held accounts, or anyone else, and there is no evidence he did so.[5]  Minimal harm was also done to Coin.mx's banks (other than them perhaps not wanting to provide banking services to a bitcoin exchange like Coin.mx, and limited and hypothetical reputational risk). Further, Anthony did not live lavishly on the approximately $12.7 million that cycled through Coin.mx's bank accounts.  He was trying to build a business in an admittedly ill-conceived and improper manner.  He did not waste away the approximately $12.7 million on expensive jewelry, homes, boats, cars or the like.

Although an enhancement based on loss amount must apply to fraud-based offenses (and the defense agrees with the Guidelines calculation and sentencing range), the gargantuan § 2B1.1 enhancement of 20 levels vastly overstates the seriousness of Anthony's offenses when considering the § 3553(a) factors.

### 4.  Anthony Murgio's Assistance of Ransomware Victims Should Not Be Factored Into His Sentence

Anthony Murgio, through Coin.mx, helped victims of ransomware schemes obtain bitcoins to pay ransomers.  Such help should not be considered a crime – both under the law and for public policy reasons – and should not be factored into his sentence, despite what the government is expected to argue to the contrary.  Finding otherwise would be unprecedented.

Although Anthony pleaded guilty to and accepts responsibility for violating two prongs of § 1960, (b)(1)(A) [state licensing] and (b)(1)(B) [federal registration] as charged in Count 1, he did not plead guilty to violating the other prong of § 1960, (b)(1)(C) [transportation of criminally derived funds], as also charged in Count 1.  With regard to the

---

[5] As an example, the Court heard the government's own trial witness Jen Wortherspoon testify that there was no effort to ever lie to or "rip off" Coin.mx customers. (See Trial Transcript at 585.)

latter Count 1 prong, the superseding indictment states in pertinent part:

> It was a part and object of the conspiracy that ANTHONY R. MURGIO . . . knowingly would and did. . . . manage . . . an unlicensed money transmitting business [Coin.mx] which . . . otherwise involved the transportation of funds known to MURGIO . . . to have been derived from a criminal offense and intended to be used to promote and support unlawful activity, to wit, extortion in furtherance of ransomware schemes, in violation of [18 U.S.C. § 1030(a)(7)] . . .

In essence, the government's theory is that because Anthony helped the victims of ransomware pay ransom (and raised rates when doing so), he aided and abetted the perpetrators of those offenses.  There is no support in law or reason for such a novel position (even if rates were raised), and its adoption would have ruinous public policy implications.

Importantly, the FBI's own statements on this issue undercut the government's position because the FBI often advises people and companies to pay the bitcoin ransoms and the FBI understands doing so is legal.  Attached as Exhibit E are an FBI alert and a news article quoting the FBI exhibiting these facts.  In a relatively recent news article, when discussing ransomware schemes at a public event, FBI Special Agent Joseph Bonavolonta, who oversees the FBI's Cyber and Counterintelligence program in Boston, is quoted as saying: "To be honest, we often advise people to just pay the ransom."  An FBI ransomware alert, which is cited in the PSR, states: "While the FBI does not advocate paying a ransom, there is an understanding that when businesses are faced with an inability to function, executives will evaluate all options to protect their shareholders, employees, and customers."

The FBI's position is understandable when one considers that ransomware victims encompass all of society, including hospitals, universities, and even police departments.

Exhibit E also includes two news reports relating to a hospital and police department, respectively, paying ransom in bitcoins.

Reputable Washington D.C.-based organizations agree with the FBI, as well as the defense's position.  Exhibit E also includes a letter from the Digital Currency and Ledger Defense Coalition (a non-profit with over 50 participating attorneys from respected law firms across the country), a recent blog post from Coin Center (a non-profit research and advocacy center that regularly testifies before Congress on these types of issues), and a recent article from Consumers Research (an independent educational organization founded in 1929).  They provide detailed and compelling explanations of the wrongheadedness of the government's unprecedented position from various perspectives.  As the Consumers Research article notes:

> Paying ransomware demands is legal, so a seller giving a person or business assistance (especially technical assistance) should logically be and remain legal.

The "WannaCry" ransomware attack, which made international news in May of this year and affected millions (resulting in numerous victims using bitcoins to pay the ransom), provides further support for this point and our position.  Finally, the defense is not aware of any case law that supports the government's novel position.

For all these reasons, the Court should not consider Anthony's assistance of ransomware victims as criminal activity and factor that negatively into his sentence.

### 5.  *De Minimis* Forfeiture Is Appropriate In This Case

The Court should enter a forfeiture order for a *de minimis* amount of money.  Since the time of Anthony's guilty plea, the government had indicated repeatedly that it would be requesting a forfeiture order for approximately $12.7 million.  Earlier today, we learned from the government for the first time that it is working to refine its forfeiture position and may

trim what it is seeking.  Regardless, the defense opposes any forfeiture order that is greater than a *de minimis* amount for a number of reasons discussed below.

By way of background, as part of his plea agreement, Anthony admitted to the forfeiture allegations of Counts 1 and 6 (conspiracy to operate an unlicensed money transmitter and conspiracy to commit bank and wire fraud) and agreed to forfeit "a sum of money representing all property, real or personal, which constitutes or is derived from proceeds traceable to the offenses alleged in those counts.  The forfeiture allegations applicable to those counts are set forth in paragraphs 47 and 52 of the sixth superseding indictment, and they are only tied to civil forfeiture allegations under 18 U.S.C. § 981(a)(1)(C).  Pursuant to § 981(a)(1)(C) and consistent with the plea agreement, any order of forfeiture can be reached only as to "any property, real or personal, which constitutes or is derived from proceeds traceable to the offense[s] alleged" under those counts.  The defense is not contesting any of that, of course.

Money, however, that belonged at all times to other people and merely passed through Coin.mx's bank accounts, (i.e., the vast bulk of the approximately $12.7 million) does not constitute the "proceeds" of that business and were never possessed, or intended to be possessed, by Anthony.  Rather, that money belonged to the Coin.mx members, as is the case with properly licensed money transmitting businesses and banks.  Therefore, per § 981(a)(1)(C) and his plea agreement, a forfeiture judgment in this case should not include funds that Anthony never possessed in the first place.

Additionally, the Eighth Amendment does not permit an excessive forfeiture order.  Such an order must not be "grossly disproportional to the gravity of [the] defendant's offense."  United States v. Bajakajian, 524 U.S. 321, 334 (1998).  Just last year, in United

States v. Viloski, the Second Circuit discussed the four-factor test that courts have employed

since Bajakajian for determining the question of "gross disproportionality":

> (1) the essence of the crime of the defendant and its relation
> to other criminal activity;
> (2) whether the defendant fits into the class of persons for
> whom the statute was principally designed;
> (3) the maximum sentence and fine that could have been
> imposed; and
> (4) the nature of the harm caused by the defendant's
> conduct.

814 F.3d 104, 110-11 (2d Cir. 2016) (citing United States v. George, 779 F.3d 113, 122 (2d

Cir. 2015)).  The Viloski court concluded that these factors were not exclusive, and held that

"when analyzing forfeiture's proportionality under the Excessive Fines Clause, courts may

[also] consider . . . whether the forfeiture would deprive the defendant of his livelihood, i.e.,

his future ability to earn a living."  Id. (internal quotation omitted).

     Here, balancing of the Bajakajian factors with the "future employment" factor

adopted in Viloski, weighs against the imposition of a multi-million dollar forfeiture

judgment against Anthony.  After all, he is not now in possession of ill-gotten gains that can

be disgorged, nor was he ever the possessor of such gains because he did not steal or defraud

any "victims" of money or property.  In short, he did not make huge profits operating

Coin.mx, and then blow them on frivolities that he depleted and cannot now be recollected.

As the PSR notes, he has limited financial means.

     A harsh forfeiture judgment, like the one the government is expected to seek, would

fail to advance the goals and purposes of criminal sentencing enumerated under 18 U.S.C.

§ 3553(a).  Anthony already will be struggling to move forward in life and put his criminal

conviction behind him once he has completed his sentence.  The effect of putting him into a

lifetime of undischargeable debt will unfairly hinder him forever, rather than advance his rehabilitation.  Further, the imposition of a crippling, life-long financial debt on a 33 year-old in response to the instant offenses would also fail to promote respect for the law.  There is no reason to expect that such a draconian penalty would justly further deter him or others from engaging in similar criminal conduct in the future.

Ordering Anthony to pay a significant forfeiture judgment as the government is expected to ask the Court to do, would be inconsistent with the law and his plea agreement, as well as excessive and counterproductive.  The Court should order a *de minimis* amount of forfeiture.

## CONCLUSION

Anthony Murgio committed crimes for which he accepts responsibility.  But the advisory Guidelines exact too high a price in this case.  For all the above reasons, an appropriate sentence for Anthony pursuant to the 18 U.S.C. § 3553(a) factors is a term that is dramatically less than the PSR's recommended 96 months, and consistent with a finding under the § 3553(a) factors that the U.S.S.G. § 2B1.1 enhancement should be deeply discounted.

Dated: June 13, 2017                              /s/ Brian E. Klein
                                                  _____
                                                  BRIAN E. KLEIN
                                                  Baker Marquart LLP

                                                  /s/ Robert A. Soloway
                                                  _____
                                                  ROBERT A. SOLOWAY
                                                  Rothman, Schneider, Soloway
                                                  & Stern, LLP

                                                  *Attorneys for Anthony Murgio*